GRADIENT OC MASTER, LTD., Caspian Capital Advisors, LLC, River Vail Holdings, L.L.C., Latigo Master Fund, Ltd., Par–Four Master Fund, Ltd., Southpaw Credit Opportunity Master Fund, LP, individually, for a class of similarly situated investors and derivatively, Plaintiffs

v.

NBC UNIVERSAL, INC., a Delaware Corporation, Citadel Investment Group, LLC, a Delaware Limited Liability Corporation, CIG Media, LLC, a Delaware, Limited Liability Corporation, W. Lawrence Patrick, R. Brandon Burgess, Henry J. Brandon, Raymond S. Rajewski, William A. Roskin, Lucille S. Salhany, Frederick M.R. Smith, Defendants,

and

ION Media Networks, Inc., a Delaware Corporation, Defendant and Nominal Defendant.

Civ. A. No. 3021–VCP.

Court of Chancery of Delaware, New Castle County.

Submitted: July 6, 2007.

Ruling orally reported: July 10, 2007.

Written decision: July 12, 2007.

C. Barr Flinn, Danielle Gibbs, Michael W. McDermott, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE; David M. Friedman, Michael M. Fay, Kim Conroy, Matthew Funk, Kasowitz, Benson, Torres & Friedman, LLP, New York City, for Plaintiffs.

Jesse A. Finkelstein, Daniel A. Dreisbach, John D. Hendershot, Richards, Layton & Finger, P.A., Wilmington, DE; Adam S. Hakki, Marc D. Ashley, Brian G. Burke, Shearman & Sterling, LLP, New York City, for Defendant NBC Universal, Inc.

Michael A. Pittenger, Berton W. Ashman, Jr., Scott B. Czerwonka, Potter Anderson & Corroon, LLP, Wilmington, DE; William McGuinness, Peter L. Simmons, Fried, Frank, Harris, Shriver & Jacobson, LLP, New York City, for Defendants Citadel Investment Group, LLC and CIG Media, LLC.

Robert S. Saunders, Skadden, Arps, Slate, Meagher & Flom, LLP, Wilmington, DE; Robert E. Zimet, Susan L. Saltzstein, Christopher P. Malloy, Skadden, Arps, Slate, Meagher & Flom, LLP, New York City, for the ION Defendant.

## OPINION

PARSONS, Vice Chancellor.

This dispute involves challenges by holders of two classes of senior preferred stock of ION Media Networks, Inc. ("ION" or the "Company") to an exchange offer being made to those stockholders as one of several transactions provided for under a Master Transaction Agreement ("MTA") to restructure the Company's ownership and capital structure. Defendants are ION, its directors, NBC Universal, Inc. ("NBCU") and Citadel Investment Group LLC and an affiliate, CIG Media, LLC, (collectively, "CIG"). ION, NBCU and CIG are parties to the MTA. Plaintiffs assert that the exchange offer violates Delaware's prohibition against coercive or misleading offers to stockholders and also improperly extracts value from minority shareholders for the benefit of a majority or controlling shareholder, namely, NBCU, CIG or both of them. The plaintiffs' complaints aver claims directly on behalf of themselves, individually and as representatives of the class of similarly situated preferred stockholders, and derivatively on behalf of ION against Defendants for allegedly willful and bad faith breaches of their fiduciary duties to ION and plaintiffs, and seek injunctive and other relief. The matter is presently before the Court on plaintiffs' motions for a preliminary injunction.

The challenged exchange offer is scheduled to close at 12:01 a.m. on July 11, 2007. After expedited discovery and briefing, the Court held a hearing on the motion for preliminary injunction on July 6, 2007. For the reasons stated below, I conclude that plaintiffs have not shown a reasonable likelihood of success on the merits as to their claims for wrongful coercion based on, among other things, the elevation feature of the exchange offer, under which if less than 90% of the senior preferred shares participate in the exchange, preferred stock of NBCU and CIG junior to plaintiffs' stock will be elevated to subordinated debt with priority over plaintiffs' preferred shares. Plaintiffs also have not demonstrated a reasonable likelihood of success on their related claims of inadequate disclosure and improper extraction of value by a controlling stockholder. Further, I am not convinced that plaintiffs

will suffer irreparable harm if the exchange offer is not preliminarily enjoined until this matter can be tried on the merits. Thus, although the balance of the hardships to the parties depending on whether an injunction issues may weakly favor plaintiffs, I have determined that considering all three factors relevant to deciding whether a preliminary injunction is warranted, plaintiffs have failed to show that such extraordinary relief is appropriate in these circumstances.

## I. FACTS AND PROCEDURAL HISTORY

### A. Background

Representatives of two classes of ION preferred stock (collectively, the "Senior Preferred Stock" or "Senior Preferred Stockholders") have brought two separate actions in this Court challenging the pending exchange offer, C.A. Nos. 3021–VCP and 3043–VCP. To date, the actions have not been consolidated, but the parties in both actions have agreed to present their motions for preliminary injunction on a coordinated basis in C.A. No. 3021.[1]

Plaintiffs in C.A. No. 3021 are a group of investors holding 13¼% Cumulative Junior Exchangeable Preferred Stock, currently accruing dividends at 14¼% ("14¼% Preferred Stock" or "Preferred Stock") of ION. Plaintiffs appear to be six different hedge funds. Three of the Plaintiffs purchased their shares after ION entered into the MTA on May 3, 2007.

ION, a Delaware corporation, is a network television broadcasting company that owns the largest television station group in the United States, operating approximately 60 television stations. The company, renamed in February, 2006 from Paxson Communications, Inc., reaches around 90 million households through reruns of shows such as "Mama's Family" and "The Wonder Years." In 1999, ION and NBCU's predecessor entered into an agreement whereby NBCU invested approximately $415 million in ION in exchange for 41,500 shares of 8% Series B convertible exchangeable preferred stock, warrants to purchase up to a total of over 32 million shares of Class A common stock, and registration rights under the Securities Act.[2]

On or around November 7, 2005, ION and NBCU entered into additional agreements to restructure NBCU's investment in the Company and to settle certain litigation that had arisen between them relating to the NBCU preferred shares. As part of the settlement, NBCU acquired contractual provisions related to its preferred shares that required ION to obtain NBCU's consent before engaging in, among other things, certain financial transactions. NBCU also received an 18–

---

1. See letter from Philip Trainer, Esq. to the Court (July 2, 2007), in C.A. No. 3043–VCP, *Ore Hill Hub Fund Ltd., Southpaw Credit Opportunity Master Fund LP, et al. v. NBC Universal, Inc., et al.* As holders of 9¾% convertible preferred stock of ION, the plaintiffs in *Ore Hill Hub Fund* contend they are similarly situated and, together with Plaintiffs here, have moved to consolidate the two actions. That motion is pending. For purposes of this Opinion, the Court generally will refer only to the facts and circumstances of the action brought by the holders of 14¼% preferred stock, C.A. No. 3021.

2. Pittenger Aff. Ex. 3 (June 8, 2007 Offer to Exchange and Consent Solicitation ("June 8 Solicitation")) at 73. In connection with Plaintiffs' pending motion for a preliminary injunction, Plaintiffs filed opening, supplemental, and reply briefs, which are cited herein as "POB," "PSB," and "PRB," respectively. Three separate groups of Defendants filed answering briefs, which are referred to as indicated parenthetically: Citadel ("CAB"), the Ion Defendants ("IAB"), and NBCU ("NAB").

month transferable call option from Lowell Paxson and certain affiliates controlled by him that, if exercised, would trigger a sale of the rest of the Company and give NBCU a controlling block of Class A and B common stock and the right to designate a nominee to purchase those shares.[3] The call option was set to expire on May 6, 2007.

At some point, ION and NBCU determined that certain rules promulgated by the Federal Communications Commission ("FCC") would prohibit NBCU from exercising the call right, leading NBCU to seek a third party to which it could transfer the call right before it expired.[4] In the latter part of 2006, NBCU and Citadel engaged in discussions and negotiations with each other with a view toward proposing a comprehensive recapitalization transaction to ION, including a transfer of NBCU's call option to CIG. From NBCU's perspective, in addition to facilitating a transfer of the option, "a fundamental component of the transaction that ultimately was proposed with Citadel was to reduce the fixed claims or functional leverage on [ION's] balance sheet."[5]

## B. ION's Board of Directors Explores Restructuring

ION had a complex capital structure and was considered overly leveraged. As of March 31, 2007, the Company had $1.1 billion in senior secured debt; the $14\frac{1}{4}\%$ Preferred Stock, with an aggregate liquidation preference and accumulated dividends of $640 million; a series of $9\frac{3}{4}\%$ Series A Convertible Preferred Stock (the "$9\frac{3}{4}\%$ Preferred Stock") with an aggregate liquidation preference and accumulated dividends of $175 million; and a series of 11% Series B Convertible Exchangeable Preferred Stock (the "Series B Preferred Stock") with an aggregate liquidation preference and accumulated dividends of $706 million.[6]

Under a previous refinancing of senior debt obligations in December, 2005, the Company was permitted to incur up to approximately $650 million of subordinated debt that could be available for use in a future recapitalization. In April, 2006, the Company retained UBS Securities LLC ("UBS") to advise it on financial strategies. In June, 2006, ION's Board created a special committee of independent directors to explore the Company's strategic options (the "Special Committee"). The following month, the Special Committee retained Lazard Freres & Co. LLC ("Lazard") as its financial advisor and Pillsbury Winthrop as its legal advisor. In the fall of 2006, ION's management publicly announced that the Company's highly leveraged position was hampering their ability to progress and the Board needed to modify its capital structure to improve liquidity and reduce obligations.[7]

The Senior Preferred Stock had mandatory redemption dates in November and December 2006. ION did not redeem the shares. As a result, the two classes of Senior Preferred Stock, including the $14\frac{1}{4}$% Preferred Stock, each elected two directors to the Board. They took office in April 2006.[8]

---

3. June 8 Solicitation at 73–74; POB at 7.

4. POB at 7; June 8 Solicitation at 75.

5. Bockhaus Dep. at 127.

6. June 8 Solicitation at 45.

7. The Special Committee also retained Skadden, Arps, Slate, Meagher & Flom LLP as special counsel in February, 2007, after receipt of the CIG/NBCU Proposal, Offer, described *infra*.

8. F. Smith Aff. ¶ 20.

## C. ION's Negotiations with NBCU and Citadel[9]

On January 17, 2007, Citadel and NBCU, substantial holders of ION preferred stock, jointly proposed an equity restructuring transaction to ION (the "CIG/NBCU Proposal").[10] The proposal contemplated a tender offer by the Company for the Class A common stock at a price in the range of $1.41 per share in cash. The proposal also called for an exchange offer, which provided holders of the 14¼% Preferred Stock the opportunity to exchange their securities for subordinated debt at a ratio of 70% of the face amount. If more than 90% of Senior Preferred Stock[11] participated in the exchange offer, CIG and NBCU would remain at the bottom of the capital structure and receive preferred stock that was mandatorily convertible into common stock.[12] The proposal also included a so-called Contingent Exchange ("Contingent Exchange" or "Elevation") that would permit CIG and NBCU to exchange up to $470 million of their preferred stock for subordinated debt if less than 90% of Senior Preferred Stock participated in the exchange offer. As participation in the exchange offer increased, CIG and NBCU would exchange a proportionally decreasing amount of preferred stock. According to Citadel and NBCU, their proposal would reduce fixed claims in the capital structure by approximately $300 million and recurring fixed charges by approximately $50 million.[13]

After evaluating Citadel's and NBCU's proposal, ION's Special Committee and Board concluded that the proposal was unacceptable without significant improvements. Between January and the end of April, 2007, the Special Committee and its advisors had numerous discussions with representatives of NBCU and Citadel about their proposal. After extensive negotiations, and a couple of revised proposals, Citadel and NBCU had made the following concessions, many of which benefited Senior Preferred Stockholders:[14]

- CIG, rather than ION, would make the tender offer for non-Paxson common stock.
- CIG, which held significant amounts of 14¼% and 9¾% Preferred Stock, agreed to participate fully in the Exchange Offer on the same terms offered to the other Preferred Stockholders, for an aggregate principal amount of $66.8 million of subordinated debt.
- CIG agreed to invest $100 million in ION.
- The initial recovery for the holders of 14¼% Preferred Stock was raised from 70% to 80% of the face amount.
- To ensure that the securities offered in the exchange would trade at par, the coupon on the notes being offered was increased from 7% to 11%.
- CIG committed to additional funding of up to $15 million to cover transaction costs, and CIG and NBCU

---

9. Facts in this section are drawn from the F. Smith Aff. ¶ 21–23.

10. F. Smith Aff. Ex. 4 (Letter from Matthew Hinerfeld, Managing Director and Deputy General Counsel of Citadel, and Bruce Campbell, Executive Vice President, Business Development of NBCU, to the ION Board (Jan. 17, 2007)) at ION001483.

11. Including the 14¼% and 9¼% Preferred Stock.

12. The initial conversion price was $0.75 per Class A common share.

13. F. Smith Aff. Ex. 4 at ION 001484.

14. *See* IAB at 8 and citations to record therein.

agreed to cover their own fees for legal counsel and financial advisors.

### D. ION Rejects Other Competing Proposals

Between January and May 2007, the Special Committee considered at least nine different proposals submitted by NBCU and Citadel, an anonymous third party, and an Ad Hoc Committee representing holders of the 14¼% Preferred Stock. For example, on February 16, 2007, certain Plaintiffs and other holders of 14¼% Preferred Stock proposed a recapitalization of ION that provided $100 million in new money to the Company. Although ION did not accept this proposal, it evidently prompted NBCU and Citadel to incorporate the $100 million component as part of their offer. In April 2007, the anonymous third party made a proposal to purchase ION through a $2.13 billion all-cash bid.

The Special Committee perceived significant execution risks with the alternative proposals made by the Ad Hoc Committee and the third party. These include the possible need for a voluntary bankruptcy filing, which the Committee did not favor, and the possible expiration of the call option and its potentially adverse effect on ION's bargaining position as to the tender offer price for the common.[15] In addition, the Special Committee's investment advisor, Lazard, found it very difficult to come up with a transaction that did not require NBCU's consent, based on the contract rights NBCU obtained in the November 2005 settlement.[16]

In part due to the fact that the call option was scheduled to expire on May 6, 2007, the Special Committee unanimously recommended on May 1, 2007 that the Board agree to the latest proposal made by Citadel and NBCU. The ION Board approved the transaction on May 3, 2007.

### E. The Master Transaction Agreement

ION, NBCU, and CIG executed the MTA on or about May 3, 2007. The MTA summarizes the Company's agreement to an approach that would take ION private under the control of CIG or NBCU. The MTA contemplates several transactions. In general terms, NBCU assigns the call option to CIG and CIG exercises the option. A new call option is then issued from CIG to an affiliate of NBCU.[17] CIG lends $100 million to ION by purchasing newly issued notes and promises to lend up to an additional $15 million to cover the expenses relating to the transaction.[18] CIG tenders for the remaining shares of Class A common stock of ION at approximately $1.46 per share (the "Tender Offer"). The MTA also requires ION to commence "[a]s soon as reasonably practicable" an Exchange Offer and Consent Solicitation ("Exchange Offer" or "Exchange") for exchanges of Senior Preferred Stock.[19] Following the closing of the call option, ION, which is expected to be substantially or completely controlled by CIG, would institute a reverse stock split.[20] Thereafter, an NBCU affiliate could exercise the call option to acquire majority control of CIG. Ultimately, the MTA preserves NBCU's ability to gain control of the Company

---

**15.** F. Smith Dep. at 110, 112, 148; Millstein Dep. at 79–80.

**16.** Millstein Dep. at 78. There is no evidence that ION ever presented any alternative proposal to NBCU for consent or that NBCU ever vetoed any such proposal. *See* Bockhaus Dep. at 138.

**17.** MTA, §§ 2.02–2.03. A copy of the MTA appears as Ex. 1 to the Pittenger Affidavit.

**18.** MTA, § 2.06.

**19.** MTA, Art. V.

**20.** MTA, Art. IV.

through a new stockholder agreement between NBCU and CIG.

On May 4, 2007, CIG commenced the Tender Offer for the ION Class A common stock in accordance with the MTA. As of June 4, 2007, approximately 40.6 million shares, or 62.1% of the Class A common stock, had been tendered to CIG. By June 15, that number had increased to over 88%.[21]

## F. The Exchange Offer and Consent Solicitation of the 14¼% Preferred Shares

ION commenced the Exchange Offer and Consent Solicitation on June 8, 2007. In the Exchange Offer, ION is offering to exchange for its outstanding 14¼% Preferred Stock newly-issued 11% Series A Mandatorily Convertible Senior Subordinated Notes due 2013 and, depending upon participation levels in the Exchange Offer, either newly issued 12% Series A–1 Mandatorily Convertible Preferred Stock or 12% Series B Mandatorily Convertible Preferred Stock.[22] ION has conditioned the Exchange Offer upon the percentage of shares tendered. If more than 50% of the shares are tendered, each tendered share of 14¼% Preferred Stock will receive $7,000 principal amount of Series A Notes (subordinated debt) and $1,000 initial liquidation preference of the Series A–1 Convertible Preferred Stock, which would rank senior to any unexchanged Preferred Stock. If holders of 50% or less of the Senior Preferred Stock tender in the Exchange Offer, tendering holders will receive $7,500 principal amount of Series A

Notes and $500 initial liquidation preference of Series B Convertible Preferred Stock, which would rank junior to any unexchanged Preferred Stock ("Minority Exchange Consideration"). The 14¼% holders who choose to participate in the Exchange also consent to, among other things, amending the existing certificate of designations to eliminate restrictive covenants, such as ION's obligation to repurchase the 14¼% Preferred Stock upon a change of control, and all voting rights provided for in the original certificates.

After the Exchange Offer commenced, ION announced on June 26, 2007, that the Company had extended the Exchange Offer generally for one day until 12:01 a.m. on July 11, 2007, and for ten business days if holders are to receive the Minority Exchange Consideration.[23] If, during that time, a majority of shares of the Senior Preferred Stock have been tendered, holders will still receive the Minority Exchange Consideration, but have to give the covenant consents.

## G. Procedural History

Plaintiffs, led by Gradient OC Master, Ltd., filed this action on June 13, 2007. That same day, Plaintiffs moved for a preliminary injunction and for expedited treatment of the case. Defendants opposed both motions. After hearing argument on June 20, I granted Plaintiffs' motion to expedite and denied, as moot, a limited request for a temporary restraining order. Plaintiffs amended their complaint on June 22, 2007.

---

21. Hendershot Aff. Ex. 22 (ION's SEC Schedule 14C Information) at 4.

22. A tranche of preferred stock at 9¾% is treated similarly in the Exchange Offer, provided that the 14¼% are exchanged before any of the 9¾% are exchanged. Fay Aff. Ex. D at 8.

23. According to a press release on ION's website, as of 12:01 a.m. on July 11, 2007 no Senior Preferred Shares had been tendered. July 11, 2007 ION Media Press Release, *available at* http://ionmedia.tv/preee/press.cfm?id=49.

The amended complaint ("Complaint") asserts nine causes of action. The First through Fourth and Sixth through Ninth Causes of Action assert claims for breach of fiduciary duty or aiding and abetting such breaches.[24] By way of relief for those claims, Plaintiffs seek injunctive and declaratory relief, rescission and rescissory damages. The Fifth Cause of Action involves a direct, individual and class, claim by Plaintiffs for damages based on an alleged breach of contract. Plaintiffs base their motion for a preliminary injunction solely on the breach of fiduciary duty claims.[25]

After expedited briefing and discovery, the Court heard oral argument on Plaintiffs' motion for a preliminary injunction on July 6, 2007. Because the Exchange Offer was set to close just after midnight on July 10, I informed the parties of my ruling at the close of business on July 10, 2007. This opinion provides the detailed reasons for my ruling.

## H. Parties' Contentions

In their motion for a preliminary injunction, Plaintiffs largely seek to enjoin the allegedly coercive aspects of the Exchange Offer based on equitable grounds rooted in Delaware law that make it actionable to "wrongfully coerce" shareholders into making investment decisions. Plaintiffs first argue that the Contingent Exchange aspect of the Exchange Offer is actionably coercive because it impermissibly induces the Preferred Stockholders to participate in the Exchange Offer, by "linking" to a decision not to participate the Elevation of junior preferred stock of NBCU and CIG to debt with priority over the Senior Preferred Stock, if less than 90% of the 14¼% Preferred Stock accept the Exchange Offer. Plaintiffs also argue that the Exchange Offer is actionably coercive because it calls for the removal of certain protective covenants from Senior Preferred Shares that are not tendered in the event that a majority (but less than 90%) of the shares decide to participate in the Exchange Offer. Plaintiffs further contend that the ION Board failed to disclose material information in their Exchange Offer and Consent Solicitation, such as their inability to obtain a fairness opinion for the Exchange Offer from three separate investment banks.

In addition, Plaintiffs contend that NBCU, CIG or the two of them together, are controlling shareholders under the Supreme Court's *Tri–Star Pictures*,[26] *Gentile*,[27] and *Gatz*[28] line of cases. That is, Plaintiffs accuse NBCU and CIG of improperly extracting value from minority shareholders for the purpose of enriching themselves. Plaintiffs allege that Defendants have diluted the value of the Senior Preferred Stock and claim that, in the absence of a legitimate business purpose, the challenged Elevation is actionable.

Defendants deny that the Contingent Exchange is actionably coercive because Plaintiffs are able to make an economic choice on the merits of the transaction.

---

**24.** Plaintiffs bring the First through Fourth Causes of Action directly on behalf of themselves and as a class action. The Sixth through Ninth Causes of Action are derivative in nature.

**25.** Although Plaintiffs have brought claims for aiding and abetting a breach of fiduciary duty, they do not seek preliminary injunctive relief based on those claims. Thus, there is

no need to address them at this stage of the proceedings.

**26.** *In re Tri–Star Pictures Litig.*, 634 A.2d 319 (Del.1993).

**27.** *Gentile v. Rossette*, 906 A.2d 91 (Del.2006).

**28.** *Gatz v. Ponsoldt*, 925 A.2d 1265, 2007 Del. Lexis 167 (2007).

Merely because Plaintiffs might not *prefer* or *like* either of their choices does not create coercion. Defendants also contend Plaintiffs have failed to identify any material deficiency in the Solicitation for the Exchange Offer. Moreover, as shareholders owning less than 50% of ION, NBCU and CIG each deny being a controlling shareholder within the meaning of *Tri–Star Pictures* and similar cases.

## II. ANALYSIS

### A. Preliminary Injunction Standard

■ Plaintiffs seek a preliminary injunction against the closing of the Exchange Offer, set to expire at 12:01 a.m., Wednesday, July 11, 2007. In order to obtain preliminary injunctive relief, the moving party must demonstrate that: 1) there is a reasonable probability that they will succeed on the merits of their claims; 2) they will suffer irreparable harm if injunctive relief is not granted; and 3) the harm that would result if an injunction does not issue outweighs the harm that would befall the opposing party if the injunction is issued.[29]

### B. Likelihood of Success on the Merits

The first prong of a preliminary injunction analysis requires that I look to the merits of Plaintiffs' claims. In support of their motion for a preliminary injunction, Plaintiffs argue that the Exchange Offer is coercive with respect to its terms and the accompanying disclosures in the June 8 Solicitation. In particular, Plaintiffs argue that under Section 5.04(a) of the MTA, entitled "Contingent Exchange," if, at the close of the Exchange Offer, tendered shares are between 50 and 90 percent (*i.e.*,

sufficient to be a majority of the shares but not for the Company to employ a short-form merger), the non-participating holders are required to give up the protective covenants present in the current Certificate of Designations ("CD") for the 14¼% Preferred Shares. Among the protections that would be eliminated are the requirement that ION redeem the shares upon a change of control and the voting rights to appoint Board directors triggered by, among other things, a failure to redeem the shares. Additionally, the Contingent Exchange triggers the Elevation of up to $470.6 million of NBCU and CIG holdings from junior preferred shares under the 14¼% Preferred Stock to subordinated debt above that stock in the Company's capital structure. The number of junior preferred shares so elevated is inversely proportional to the number of shares of 14¼% Preferred Stock tendered into the Exchange.

If tendered shares fall below 50% (*e.g.*, zero to minimal participation), closer to $470.6 million of NBCU and CIG holdings of junior preferred shares will be elevated to debt. Plaintiffs emphasized that the fairness opinion relied upon by the ION Board as to the MTA transactions in general, given by investment bank Houlihan Lokey Howard & Zukin ("Houlihan"), reports the enterprise value of ION to be between $1.61 to $2.01 billion. Before the Exchange Offer, the Company had $1.13 billion in senior secured debt. Thus, although the 14¼% Preferred Shares are currently within the enterprise value of the Company, the Elevation provided for in the Contingent Exchange would subordinate the 14¼% to such a degree that the exchange of NBCU and CIG shares would

29. *Gimbel v. Signal Cos., Inc.*, 316 A.2d 599, 602–03 (1974); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 179 (Del. 1985). Plaintiffs must support each of these requirements and demonstrate that preliminary injunctive relief is needed and warranted.

completely or substantially push the 14¼% shareholders "out of the money." [30] Plaintiffs characterize their situation as one of a "prisoner's dilemma" of being forced to make a choice without knowing what choice is made by others where each others' choice directly affects the potential outcomes. Specifically, they contend:

> Here, Plaintiffs must choose between: (a) refusing to exchange and facing the devaluation caused by the NBC/CIG Elevation, or (b) participating in the Exchange and accepting its punitive redistribution of debt and stripped down preferreds, in the hope that over 90 percent of holders will also participate. Of course, this dilemma is increased exponentially by the possibility that 90 percent will not be reached, but more than 50 percent will. In such a case, nonparticipants face the doubly punitive result of: (a) devaluation through the NBC/CIG Elevation, and (b) the stripping of all material rights from the Certificate governing their holdings. [31]

In that regard, Plaintiffs argue that they are prevented from choosing the status quo and must select between two punishments in terms of loss of value in their securities.

Defendants respond that claims of preferred shareholders are almost exclusively based in contract. According to Defendants, therefore, any cognizable claims Plaintiffs might have stem from the contract rights they have under their CD, and not from any fiduciary duty owed to them by a Defendant. Moreover, Defendants argue that the sole remedy under the CD for any and all of the alleged violations presented in this case is the ability to elect two directors to ION's Board. Thus, Defendants urge the Court to deny a preliminary injunction because the CD effectively precludes Plaintiffs from obtaining such relief.

Defendants also dispute Plaintiffs' claim of being "pushed out of the money" because Plaintiffs still retain the ability to make a purely economic decision. Although the circumstances may make one choice more compelling than the other from a specific Plaintiff's point of view, Defendants argue that influencing a transaction so that one option is more attractive than another hardly makes such a transaction actionably coercive or "coercive in a legal sense." Defendants point to months of deliberations by the Special Committee of ION, with extensive advice from financial and legal advisors, before they recommended the MTA, a disinterested board who voted in favor of the overall series of transactions contemplated by the MTA, and a fairness opinion provided by Houlihan relating to the transaction as a whole to underscore the overall benefit provided to ION and all its shareholders, including common shareholders.

### 1. Applicable legal principles to coercion claims

■ As a general rule, preferred shareholders' rights are primarily contractual in nature. [32] Therefore, those rights are governed broadly by the express provisions of the company's certificate of incorporation [33] and specifically through the

---

**30.** Compl. ¶¶ 47–50.

**31.** PSB at 24.

**32.** *Rothschild Int'l Corp. v. Liggett Group, Inc.*, 474 A.2d 133, 136 (Del.1984).

**33.** *Id. See also Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 593 (Del.Ch.1986)

("Generally, the provisions of the certificate of incorporation govern the rights of preferred shareholders, the certificate ... being interpreted in accordance with the law of contracts, with only those rights which are embodied in the certificate granted to preferred shareholders.") (quoting *Judah v. Del. Trust Co.*, 378 A.2d 624, 628 (Del.1977)).

document designating the rights, preferences, etc. of their special stock.[34] Where, however, a right asserted is not to a preference but rather a right shared equally with the common, the existence of such right and the scope of the correlative duty may be measured by equitable as well as legal standards.[35]

In that regard, this Court has recognized that preferred shareholders share the same right as common shareholders to be free from wrongful coercion in a stockholder vote.[36] In so holding, Delaware courts have determined that "the standard applicable to the [preferred shareholder's] claim of inequitable coercion is whether the defendants have taken actions that operate inequitably to induce the preferred shareholders to tender their shares for reasons unrelated to the economic merit of the offer."[37] In other words, the ordinary definition of "coercion," something akin to intentionally persuading someone to prefer one option over another is not the same as saying that the persuasion would so impair the person's ability to choose as to be legally actionable.[38] The challenged conduct must be "wrongfully" or "actionably" coercive for a legal remedy to ensue.[39] Thus, an action is not coercive unless a shareholder is wrongfully induced to make a decision for reasons unrelated to merit.[40] On the other hand, an action is "actionably coercive" if, in the context of a tender offer, it "threatens to extinguish or dilute a percentage ownership interest in relation to the interests of other stockholders."[41]

In *In re General Motors Class H Shareholders Litigation,*[42] Vice Chancellor Strine clarified the distinction between coercion (*i.e.* circumstances that lead to a preference in voting but are not legally actionable) and "wrongful" or "actionable" coercion. In that case, GM issued GMH stock, which represented rights in equity and assets in the parent company, GM, but which tied dividends to the financial performance of Hughes Electronics, a GM subsidiary that consisted of Hughes Defense, Hughes Telecom, and Delco. In an effort to recapitalize, the GM board proposed and approved a spin off of Hughes Defense to Raytheon and, in doing so, transferred Delco into the parent GM. The transactions also included a $1 billion infusion of money by Raytheon into the re-

34. *Jedwab,* 509 A.2d at 593.

35. *Id.* at 593–94.

36. *Eisenberg v. Chicago Milwaukee Corp.,* 537 A.2d 1051, 1061 (Del.Ch.1987) (quoting *Ivanhoe Partners v. Newmont Mining Corp.,* 533 A.2d 585, 605, *aff'd,* 535 A.2d 1334 (Del. 1987)).

37. *Id.*

38. *Lacos Land Co. v. Arden Group, Inc.,* 517 A.2d 271, 277 (Del.Ch.1986).

39. *Id.* As Chancellor Allen stated:

For purposes of legal analysis, the term "coercion" itself—covering a multitude of situations—is not very meaningful. For the word to have much meaning for purposes of legal analysis, it is necessary in each case

that a normative judgment be attached to the concept ("inappropriately coercive" or "wrongfully coercive," etc.). But, it is then readily seen that what is legally relevant is not the conclusory term "coercion" itself but rather the norm that leads to the adverb modifying it.

*Id.* (quoting *Katz v. Oak Indus.,* 508 A.2d 873, 880 (Del.Ch.1986)).

40. *Lieb v. Clark,* 1987 WL 11903, at *4, 1987 Del. Ch. Lexis 442, at *12 (June 1, 1987) (quoting *Macfadden Holdings, Inc. v. John Blair & Co.,* 1986 WL 7356 (Del.Ch. July 2, 1986)).

41. *Weiss v. Samsonite Corp.,* 741 A.2d 366 (Del.Ch.), *aff'd,* 746 A.2d 277 (Del.1999).

42. *In re Gen. Motors (Hughes) S'holders Litig.,* 734 A.2d 611 (Del.Ch.1999).

maining portion of Hughes Electronics, Telecom. Upon approval of·the transaction by shareholders, GMH shareholders would have economic interests as direct stockholders in Raytheon, as the purchaser of Hughes Defense, through a dividend interest in Hughes Telecom, as the holder of recapitalized GMH shares, and through a tenuous economic interest in Delco, now a division of GM.

The recapitalization efforts needed majority approval from both the GM and the GMH shareholders. As part of the consent process, GM informed GMH holders that a vote to approve the transactions would have the effect of waiving any possible application of certain covenant amendments contemplating GMH remedies upon a recapitalization. The solicitation also disclosed that the transactions, as contemplated, were entitled to tax-free treatment but that, because of recently enacted federal tax legislation that would become effective after the closing of the transactions, a future recapitalization involving Hughes Defense, if consummated, would be subject to taxable gains.

The GMH shareholders alleged that they were actionably coerced by having to choose between giving up recapitalization covenants intentionally tied to an affirmative vote or blocking the transactions and squandering potentially enhanced values realized from those transactions. The GMH shareholders also alleged that the board actionably coerced them by disclosing that the Hughes recapitalization would receive favorable tax treatment, but that future transactions might not.

The court found no actionable coercion in the board's actions regarding the waiver of the recapitalization provision. First, the court noted that neither allegation stated a claim that the coercive actions were "unrelated to the merits of the Hughes Transactions." [43] As the court quipped, "you can't have your cake and eat it too"; [44] by alleging coercion, plaintiffs attempted to take the benefit of a company's recapitalization and, notwithstanding that benefit, insure their position by seeking, in addition, recapitalization covenant protection. However, "the opportunity to make this choice by vote carried with it a concomitant obligation on the part of the voters to accept responsibility for the outcome." [45]

Second, and perhaps more importantly, the court looked at the board's rationale for relating the covenant stripping to the transactions and determined that the "GMH stockholders had a free choice between maintaining their current status and taking advantage of the new status offered by the Hughes Transactions." [46] In particular,

[43]. *Id.* at 620.

[44]. *Id.* at 621.

[45]. *Id.* Other cases have reached the same conclusion. *See, e.g., Katz v. Oak Indus.,* 508 A.2d 873, 881 (Del.Ch.1986) (upholding transaction that conditioned exchange offer to bondholders on receipt of exit consents); *Cantor Fitzgerald, L.P. v. Cantor,* 2001 WL 1456494, at *8–9 (Del.Ch. Nov. 5, 2001) (exchange offer coupled with vote for amendments that would reduce economic protections to non-tendering holders not coercive, despite "compelling economic incentives for participating in the Exchange Offer"); *In re Marriott Hotel Props. II Ltd. P'ship Unitholders Litig.,* 2000 WL 128875, at *19 (Del.Ch. Jan. 24, 2000) (holding that it was not wrongfully coercive to make tender offer conditional on obtaining sufficient consents for allegedly unfair amendments to partnership agreement).

[46]. *In re Gen. Motors (Hughes) S'holders Litig.,* 734 A.2d at 621. Thus, "if a GMH stockholder had a different opinion, she was free to express that view at the ballot box." *Id.* at 626.

The GM Board had no duty to structure the Hughes Transactions so as to trigger the Recap Provision, and thereby avoid asking the GMH stockholders to choose between the potential for a premium under the Recap Provision and the deal consideration. They were permitted to structure the deal as they did so long as they did not strong-arm the GMH stockholders into voting for it.

Such strong-arming is absent here. In the event that the Hughes Transactions did not receive GMH stockholder approval, the GMH stockholders would have been in precisely the same position they were in before the vote.[47]

A board's decision to construct a recapitalization without triggering contractual covenants is not, the court concluded, actionably coercive.

In making that determination, the court in *GM* focused on the *manner* in which the board used covenant stripping. In particular, the court held that a board's choices to formulate a business decision are given deference by the courts unless it impacts unfairly, or "strong-arms" the vote so as to force a shareholder, for reasons outside of the economic merit, to tender into the offer. The court concluded that the board's use of the covenant stripping did not amount to actionable coercion because the stockholders, if they chose not to tender, would still be in the same position they had been before the vote.[48]

"Being in the same position," however, should not be read literally. The court went on to analyze the tax-treatment disclosure:

> However, if the electorate decided to choose the status quo, GM informed them that they should not expect that a future transaction 'structured in a manner similar to the Hughes Transactions' could be accomplished in a tax-free manner. This information was material and informed the GMH stockholders of a reality with which GM and they had to contend.[49]

A vote, by its nature, forces shareholders to suspend artificially the present circumstances in a snapshot economic situation. It is not, however, the same as suggesting that the economic world itself does not move forward. Keeping the shareholders in the "same" position, then, does not require an "identical" position, economic or otherwise. Instead, a shareholder is actionably coerced when he is forced into "a choice between a new position and a compromised position" for reasons other than those related to the economic merits of the decision.[50]

An application of this analysis can be seen in *AC Acquisitions*.[51] Over the course of several months, shareholders of Anderson, Clayton attempted to bring the

---

**47.** *Id.* at 621.

**48.** Presumably, in *GM*, if a majority of the shareholders voted to approve the transaction, it would have occurred and all the shareholders would have had the benefit of the transaction. The situation in this case is slightly different. If a majority of the 14¼% Preferred Shares are tendered into the Exchange, they no longer will own 14¼% shares. Those who do not accept will retain their 14¼% shares, but have them stripped of various covenants based on the consents of the tendering shareholders. In this sense, the current dispute is more analogous to *Katz v. Oak Industries,* 508 A.2d 873 (Del.Ch.1986).

**49.** *In re General Motors (Hughes) S'holders Litig.,* 734 A.2d at 620–21.

**50.** *Id.* at 621.

**51.** *AC Acquisitions Corp. v. Anderson, Clayton & Co.,* 519 A.2d 103 (Del.Ch.1986) (examining coercion in the context of a *Unocal [Corp. v. Mesa Petroleum Co.,* 493 A.2d 946 (Del.1985)] analysis).

company to the bargaining table. Having failed to do so, they formed a new corporation, AC Acquisitions, to make a cash tender offer for any and all shares of Anderson, Clayton at $56 per share. One day later, Anderson, Clayton announced the commencement of a self-tender offer for 65.5% of its outstanding stock at $60 per share cash. The company also announced that, in connection with the closing of its tender offer, the company would sell stock to a newly-formed employee stock ownership plan ("ESOP") amounting to 25% of all issued and outstanding stock following such sale. AC Acquisitions sought preliminary injunctive relief against the company to, among other things, prohibit it from purchasing any shares pursuant to its self-tender offer. Plaintiffs alleged actionable coercion and cited the timing of the Anderson, Clayton offer and the decision to tender for 65.5% of the outstanding stock as elements of the self-tender reflective of the defendants' motives to actionably coerce shareholders into taking the company's offer.

Chancellor Allen remarked that, "if all that defendants have done is to create an option for shareholders, then it can hardly be thought to have breached a duty." [52] The company, however, artificially manufactured circumstances surrounding the initial shareholder decision under which "no rational shareholder could afford not to tender into the company's self-tender offer at least if that transaction is viewed in isolation." [53] The Chancellor explained that:

> What is clear [from both parties' expert testimony on the value of the shares], is that a current shareholder who elects

not to tender into the self-tender is very likely, upon consummation of the company transaction, to experience a substantial loss in market value of his holdings. The only way, within the confines of the company transaction, that a shareholder can protect himself from such an immediate financial loss, is to tender into the self-tender so that he receives his *pro rata* share of the cash distribution that will, in part, cause the expected fall in the market price of the company's stock.[54]

In structuring such an option, the company precluded as a practical matter shareholders from choosing to accept the AC Acquisitions tender offer based on its economic merits. No reasonable investor would be able to choose between two tender offers; instead, and because of the board's actions, the shareholder effectively was forced to take the corporation's self-tender *regardless* of the economic merits of each proposal. Thus, the court held that the company moved the shareholders into a compromised, or actionably coercive, situation.

Other cases discussing coercion versus actionable coercion comport with this concept. A tender offer, for example, that includes a market premium intended to induce share participation, is not actionably coercive.[55] A tender offer that includes a premium, but limits acceptance to 47% of outstanding shares is not actionably coercive.[56] Accurately disclosing circumstances or realities surrounding a recapitalization plan, such as informing shareholders that the majority shareholder will approve the transaction (thus making the recapitalization virtually assured) is

**52.** *Id.* at 113.

**53.** *Id.*

**54.** *Id.* at 114.

**55.** *See Weiss v. Samsonite Corp.,* 741 A.2d 366, *aff'd,* 746 A.2d 277 (Del.1999).

**56.** *See Lieb v. Clark,* 1987 WL 11903, 1987 Del. Ch. Lexis 442 (June 1, 1987).

not actionably coercive.[57] Nor is it actionably coercive to disclose, pursuant to the New York Stock Exchange rules, that a two-thirds vote of approval will maintain a stock's status,[58] or that a change in federal legislation will cause assets to be categorized differently for tax purposes.[59] Similarly, a company's choice to self-tender for a majority of shares through a dutch auction, thereby requiring the selling stockholders to determine the sale price within a range of possible prices specified by the buyer, is not actionably coercive.[60]

On the other hand, as discussed previously, a board's determination to self-tender for less than all of its shares for a higher price immediately following a third-party tender offer is actionably coercive.[61] A tender offer deliberately placed at an all-time low market price and accompanied by a board's threat to delist the shares following the close of the offer was found actionably coercive.[62] In a post-trial decision, this court concluded that the "the tender offer price [offered by the board] was not likely to assure that the public minority stockholders would receive the true value of their shares"[63] and was actionably coercive because "the public stockholders had to either accept this price and tender their shares or to hold on to their shares" in an environment that nearly guaranteed they would be devalued due to the board's decision to delist, highly leverage the company, and probably not issue dividends for a number of years. In these situations, the board's actions leveraged a shareholder's position to induce an outcome based on matters unrelated to the merits of the corporation's proposal. In such a compromised position, the Delaware courts have held that the board's actions are likely to be considered strong arming and therefore actionably coercive.

In the case at hand, Plaintiffs allege three actionably coercive actions. First, Plaintiffs allege that the Board's June 8 Solicitation omits material information relevant to the shareholders' decisionmaking. These allegations are discussed *infra.* Second, Plaintiffs suggest that the Board's requirement that tendering preferred shareholders consent to the elimination of certain existing rights of their preferred shares ("exit consents") is actionably coercive. Third, Plaintiffs allege that the Elevation, or the Contingent Exchange, is actionably coercive. I turn first to the exit consents.

## 2. Exit consents

■ Based on the evidence adduced to date, I am not persuaded that the exit consents in the Exchange Offer are actionably coercive. Consequently, Plaintiffs have not shown a reasonable likelihood of

**57.** *See Williams v. Geier,* 671 A.2d 1368, 1383–84 (Del.1996).

**58.** *Id.*

**59.** *In re Gen. Motors (Hughes) S'holders Litig.,* 734 A.2d 611, 619–20 (Del.Ch.1999).

**60.** *See Cottle v. Standard Brands Paint Co.,* 1990 WL 34824, 1990 Del. Ch. Lexis 40 (Mar. 22, 1990). The court in *Cottle* acknowledged that the dutch auction format encouraged stockholders who wished to maximize the chance that the company would buy their shares to tender at the low end of the specified price range. *Id.* at *3–4, 1990 Del. Ch. Lexis 40 at *9–11. Nevertheless, the court found no actionable coercion because the offering materials fully disclosed how the format worked and its likely effect on the sale price. *Id.* at *4, 1990 Del. Ch. Lexis 40 at *11.

**61.** *AC Acquisitions Corp. v. Anderson, Clayton & Co.,* 519 A.2d 103 (Del.Ch.1986).

**62.** *See Eisenberg v. Chicago Milwaukee Corp.,* 537 A.2d 1051 (Del.Ch.1987).

**63.** *See Kahn v. U.S. Sugar Corp.,* 1985 Del. Ch. Lexis 522, at *17–18 (Dec. 10, 1985).

success as to this aspect of their challenge to the Exchange Offer. Under the Exchange Offer, a holder of 14¼% Preferred Stock who decides to tender her shares also must provide an exit consent to the stripping of various covenants from the remaining 14¼% shares. If more than 50 percent of the 14¼% shares tender, the covenant stripping will take effect.

As discussed above, this allegation, as *In re General Motors* explains,[64] manifests Plaintiffs' attempt to put one foot in a new bargain, and still keep the other foot in the previous game by hedging, through the related covenant protection, the original bargain. A majority of 14¼% shareholders can either take the offered exchange of debt, thus removing themselves from their originally bargained for position, or choose to hold on to their 14¼% Preferred Stock. Plaintiffs contend that the non-tendering shareholders are then placed in an economically disadvantaged position. Although linking the vote on the covenants to the decision to tender threatens to reduce economic protections to non-tendering holders, the shareholders, in the aggregate, are free to choose between accepting the new debt securities (by tendering one's shares), or staying in one's place (and refusing to tender). Should a majority of the 14¼% Preferred Stock choose to support the Company's decision to recapitalize in this manner, the elimination of the non-tendered shares' covenants is merely an effect of the reality that a majority of the 14¼% peers have disagreed with the non-tendering shareholders and concluded that accepting the Exchange Offer is in their best interest. The amendment of the CD for the 14¼% Preferred Stock by the holders of a majority of that class of stock is authorized by the CD.

Further, ION's Board had no duty to structure these transactions in a way to trigger the contractual covenants. To suggest that the Board must fashion an imitative recapitalization or favor one group of shareholders over the overall benefit to the corporation here would contravene the fundamental principle that a board may freely make decisions that benefit ION as a whole. Thus, I provisionally conclude that ION's conditioning of a 14¼% Preferred Shareholder's acceptance of the Exchange on that shareholder's also providing a consent to delete certain covenants of the 14¼% Preferred Stock is not actionably coercive.

### 3. The Elevation provisions

■ Additionally, on the current record, I do not find the Elevation feature of the Exchange Offer actionably coercive. Accordingly, I conclude that Plaintiffs do not have a reasonable likelihood of success of prevailing on that aspect of their claims.

The Contingent Exchange aspect of the Exchange Offer is an integral part of the economics of the exchange and is, broadly, one aspect of a larger Exchange Offer designed to delever ION over time. The Exchange Offer results initially in only a modest reduction of fixed claims and fixed charges against the Company. Over time and with maximum participation, however, mandatory conversion of the newly issued convertible securities would create a major benefit in terms of "deleveraging" the Company.[65] This benefit also would inure to Plaintiffs and their class.

Defendants saw the Exchange Offer as part of a larger transaction designed to confer economic benefit on ION. For example, Frederick Smith, a member of the

---

64. In referring to this case, I also include its progeny, several of which I previously noted, *see supra* n. 45.

65. F. Smith Aff. Ex. 30 (Apr. 23, 2007 Lazard Report to Special Committee) at ION 001040.

ION Board and the Special Committee, expressed the view that, under the CIG/NBCU Proposal, "the Corporation's preferred stockholders would be offered a meaningful premium to incentivize participation in the proposed exchange offer" and provide an economic choice to participate.[66] As a representative of NBCU explained, NBCU and Citadel intentionally "set up a structure where everyone in the capital structure would be incented to take a discount." [67]

The Special Committee appreciated the economics of the Exchange Offer and sought to improve the premiums offered to the Senior Preferred Stock. "From the standpoint of the Special Committee, our goal was to negotiate the best transaction for the Company and to increase the likely participation in the exchange by improving the recoveries for the 14¼% Preferred Stock." [68] Through its discussions and negotiations, the Special Committee analyzed anticipated levels of participation by the Preferred Stockholders as well as the integrated economic incentives structurally built into the proposed Exchange Offer.[69] Investment banks provided to the Special Committee trading data, enterprise values, and valuations to assist them in trying to provide economic benefit to the 14¼% Preferred Shareholders.[70] Before the Special

Committee vote on May 1 and even on the day the MTA was approved, members of the Special Committee sought to negotiate better recovery values for the Preferred Shareholders.[71] These few excerpts from the extensive negotiating history of the Exchange Offer and MTA are illustrative only. The evidence presented convinces me that all the parties recognized the economic aspects of the decision presented to the 14¼% Preferred Stock to either tender into the Exchange Offer or decline to do so and have the Elevation occur.

No party disputes that the Elevation, in part, was included as a deliberate attempt by NBCU and Citadel to induce tendering. Even Lazard recognized that "there is a significant likelihood that the Citadel/NBC exchange offer, if launched, would not be highly subscribed." [72] The issue, however, is whether linking the Elevation to the shareholder's decision to tender "strong-arms" the vote in such a manner that Plaintiffs are precluded from making a decision on the economic merits of the offer. To use Chancellor Allen's language in *AC Acquisitions*, does the Contingent Exchange aspect of the Exchange Offer prevent the Preferred Shareholders from making a decision in the sense that "no rational shareholder" could afford not to

---

66. F. Smith Aff. Ex. 25 (May 1, 2007 ION Minutes of the Board). The Elevation concept was part of the CIG/NBCU Proposal from its inception. *See* Fay Aff. Ex. E (referring to Jan. 6, 2007 email from Todd Gjervold of Citadel to Jay Bockhaus of NBCU stating that it is "our desire to maximize the utilization of the sub debt basket [*i.e.*, Elevation] to incentivize the preferreds to exchange").

67. Fay Supp. Aff. Ex. F (Bockhaus Dep.) at 56.

68. F. Smith Aff. ¶ 63.

69. F. Smith Aff. Ex. 25 (May 1, 2007 ION Minutes of the Board).

70. *See, e.g.,* F. Smith Aff. Ex. 2 (May 1, 2007 UBS presentation) at 18–24; Ex. 30 (4/23/07 Lazard Presentation) at 6–9, Ex. 37 (4/15/07 Presentation) at 4–7.

71. Fay Aff. Ex. A (F. Smith Dep. Ex. 9). As Plaintiffs emphasized at argument, there is no evidence that the Special Committee obtained any concessions from NBCU or Citadel regarding the Elevation-related terms of the Contingent Exchange. The various concessions they did obtain pertained more to the terms of the debt securities offered to the Senior Preferreds.

72. F. Smith Aff. Ex. 30 at 1.

tender into the Company's offer?[73] The Exchange Offer, while perhaps complicated, still preserves the ability of the Senior Preferred Shareholders to decide based on the economic merits of each alternative whether to tender their shares into the Exchange or retain them and endure the Elevation and possible covenant stripping.

At argument, Plaintiffs seemed to argue that, to use a "carrot and stick" analogy for inducements, a company may employ carrots or sticks in creating a security or other asset that it then offers to some or all of its stockholders, but may not as part of the same offer intentionally attach sticks or adverse aspects to a stockholder's decision to stay put, and not accept the offer. In oversimplified terms, Plaintiffs argue that a stockholder should have the right, as one of its options, to maintain the status quo. Based on my review of numerous coercion cases previously decided, I do not believe our law or the cases support such a sweeping proposition. Further, in the circumstances of this case, Defendants' actions in "linking" the Elevation provisions to the Exchange Offer and, specifically, to the situation in which significant numbers of Senior Preferred Shareholders reject the Exchange, appears to be logical and consistent with the legitimate objectives of ION to improve its capital structure and begin reducing its debt in terms of both fixed claims and fixed charges. Moreover, the result is that the 14¼% Preferred Stock must choose between at least two possible alternatives, both of which have pros and cons depending on each investors' views as to the future prospects for the Company. These are the types of risks and analyses sophis-ticated investors, like the holders of ION's Senior Preferred Stock appear to be, must deal with everyday.

Defendants aver that the Contingent Exchange portion of the overall transactions was inserted as a mechanical adjustment of their risk, based on the number of tendering 14¼% shares. Plaintiffs, then, challenge the Exchange Offer by presenting evidence they contend shows that NBCU and CIG arranged the transaction this way to strong arm the Preferred Shareholders into taking the Exchange or to reap a windfall, if they did not. I provisionally find that the evidence does not support so sinister an inference.

Frederick Smith, a member of the Special Committee, testified that he understood from Citadel and NBCU's presentation that the Elevation of NBCU stock was

> an effective way of having a successful recap. Because it would induce, if you will, or provide added inducement to the senior preferreds to in fact exchange. And that if they didn't exchange, that NBC wanted to take advantage of that [debt] basket [i.e. the Elevation of the junior preferred shares into subordinated debt].[74]

Todd Gjervold of Citadel stated, "I believe that [the manner in which the sliding scale in the Exchange Offer is constructed] is the most effective way to distribute value and to induce the exchange."[75] And as ION's brief underscores, the Elevation present in the Exchange Offer "was insisted upon" by NBCU and Citadel.[76]

Adding color to their claim of coercion, Plaintiffs assert that the Exchange Offer

73. Interestingly, in this case, Plaintiffs predicted the opposite, *i.e.*, that no one would tender into the Exchange. Evidently, that is what has occurred thus far.

74. Fay Supp. Aff. Ex. A at 38–40.

75. Fay Supp. Aff. Ex E (Jan. 6, 2007 email from T. Gjervold of Citadel to J. Bockhaus of NBCU).

76. IAB at 15.

forces them to choose between two evils: (a) new debt and preferred shares they contend are valued at only 71% of the 14¼ % Preferred Stock and reflect interest rate reductions of as much as 325 basis points; or (b) keep the 14¼% shares but "endure punitive effects" of the Elevation which, according to Plaintiffs, is improperly favorable to NBCU.[77] Plaintiffs also stress that Defendants failed to obtain a fairness opinion relating to the Exchange Offer that might otherwise substitute for or buttress the Board's accumulated analysis of the NBCU–CIG offers. On the record available at this stage, however, I am not convinced that Plaintiffs are not likely to succeed in proving that the economic terms of the Exchange Offer are unfair to them.

Although there is sharp conflict over the fairness of the Exchange Offer among the witnesses, I find Defendants' evidence slightly more convincing. Plaintiffs, supported by their expert, Lloyd A. Sprung, say that no premium constituting fair consideration to the Senior Preferred Stockholders existed at the time of the June 8 Solicitation because, "even if it is assumed that the new securities offered in the Exchange traded at their face value (*i.e.*, 80 percent), the *current* market price for the 14¼% Senior Preferred Shares is 89.7 percent." [78] Plaintiffs further assert that any premium claimed by Defendants "was gone by May 4, 2007—the day the MTA was announced." [79] In response, Defendants aver that the ION Board received extensive advice on May 1, 2007, from both UBS and Lazard that the Exchange Offer "provided a clear premium to the preferred stockholders based on the *then* trading ranges of their respective securities." [80] In its presentation, UBS advised ION's Board that the premium to 14¼% Preferred Stockholders represented "a 10.7%–41.8% premium to the unaffected trading price on January 17, 2007, and a 6%–35.7% premium to the *then-current* trading price." [81] Plaintiffs' focus on whether a premium existed on June 8, 2007, the date ION launched the Exchange Offer, seems misplaced. To determine whether the Exchange Offer provided a premium to Senior Preferred Stockholders, this Court more likely would consider whether such a premium existed in relation to the unaffected stock value, using a date before news of the MTA or the terms of the Exchange Offer became known in or about early May 2007.[82] Defendants' witnesses used a similar approach.[83]

77. PSB at 2–3.

78. POB at 10 n. 3 (citing Sprung Aff. ¶¶ 22–23) (emphasis added).

79. *Id.* at 17.

80. Millstein Aff. ¶ 29 (emphasis added).

81. S. Smith Aff. ¶¶ 8–9 (emphasis added).

82. For purposes of the pending preliminary injunction motion, I express no opinion as to whether the consideration offered in the Exchange and the related Elevation is, in fact, "fair." Rather, I conclude that Plaintiffs have not shown a reasonable likelihood of success in proving that it is unfair and should contribute to a finding of actionable coercion.

83. The economic merits of the Contingent Exchange are less clear. For example, James Millstein, a managing director at Lazard, testified that the Elevation "step-downs were inconsistent with sort of the traditional step-downs in our business. Step-downs being the relative recovery rates offered to different classes of security holders based on their relative priority." Fay Supp. Aff. Ex. B (Millstein Dep.) at 10–12. Further, Millstein considered unique a transaction where a company purchased at par junior equity interests that were trading at 35% of their accreted claim. In his experience at Lazard, Millstein had never participated in such a transaction. According to ION's Answering Brief, at more than 90 percent participation in the Exchange Offer, the anticipated recovery for NBCU on their junior preferred was only 20 to 30 percent of the

NBCU and Citadel included the Elevation in the Exchange Offer to control their risk in a transaction aimed at delevering ION. The risk of their bargain is directly tied to the degree of acceptance (or non-acceptance) of the Exchange Offer by the Senior Preferred Shares. Conversely, Defendants contend that the Elevation provision does not preclude Plaintiffs from making a decision rooted in the economic merits of the available alternatives and their view of ION's prospects after implementation of the MTA.

I also believe that Plaintiffs misinterpret the case law as it relates to the ability to "be in the same position." Merely choosing to remain in a position does not mean maintaining an equal and guaranteed economic position, particularly in the context of preferred shares. The ION Board, analogous to GM, informed the Preferred Stockholders that, should the Shareholders collectively approve the Exchange Offer, non-tendering Shareholders should not expect to be in the same position because the Company will have begun to implement the process set forth in the Offer. Those simply are the realities the Senior Preferred Stockholders and the Company must contend with upon the successful closing of the Exchange Offer.

Consistent with *AC Acquisitions, Kahn v. United States Sugar Corp.*, and *Eisenberg* and as discussed above, I do not, at this preliminary stage, find persuasive Plaintiffs contention that the Exchange Offer with the Elevation feature they criticize is actionably coercive. Unlike the cases that have held defendants' actions to be actionably coercive, Plaintiffs here merely allege the *risk* of being "put out of the money." Such a risk is inherent in the bargain a preferred shareholder makes, which, as in this case, generally includes the possibility that the company later can issue more senior debt or other securities without the preferreds' consent.

The Certificate of Designations between the 14¼% Preferred Stockholders and ION confirm this conclusion. In the CD, the parties have, under Section f, provided for specific remedies in certain situations that involve issuance of debt or payments to certain third parties (such as the Exchange Offer contemplates). In such situations the CD specifies the exclusive remedy between the parties to be the election of "the lesser of two directors and that number of directors constituting 25% of the members of the Board of Directors." [84]

Additionally, the facts surrounding the MTA raise questions about the degree of influence exerted by NBCU over the negotiations and, broadly, the corporation. The potential recapitalization of ION was made more complex by the fact that, under the terms of the Certificate of Designations of NBCU's Series B Preferred Stock, ION is prohibited from incurring additional indebtedness without the consent of NBC.[85] Nevertheless, as discussed *infra* in relation to Plaintiffs' *Tri–Star* claim, based on all the evidence currently available, I find that Plaintiffs have not shown a rea-

face value plus accrued dividends, and, at zero percent participation, NBCU's recovery through the Elevation would be about 54 percent. IAB at 14–17.

84. Saunders Aff. Ex. 4(CD) § (f)(iv)(A).

85. *See generally* 2d Saunders Aff. Exs. 2, 3 (Nov. 7, 2005 Amended and Restated Investment Agreement by and between Paxson Communications Corporation and NBC Universal, Inc. and Second Amended and Restated Certificate of Designations of the Powers, Preferences and Relative, Participating, Optional and other Special Rights of 11% Series B Convertible Exchangeable Preferred Stock and Qualifications, Limitations and Restrictions).

sonable likelihood of success in proving that NBCU was a controlling shareholder.

For all of these reasons, I find that Plaintiffs are not likely to succeed on their claim that the Exchange Offer, by its terms, is actionably coercive.

#### 4. Plaintiffs' Disclosure Claims

■ As a corollary to the coercion arguments addressed above, Plaintiffs allege material omissions from the June 8 Solicitation filed with the SEC render the Exchange Offer actionably coercive. Specifically, Plaintiffs complain that ION inadequately disclosed its failure to obtain a fairness opinion for the Exchange Offer. Plaintiffs further allege that ION should have made the following disclosures: (a) that the Elevation could cause ION to become insolvent according to Houlihan's fairness opinion; (b) the nature of NBCU's influence over the negotiation and approval of the MTA; (c) how ION will raise $545 million in new debt to repurchase the junior preferred shares when it has "no legally available funds" to mandatorily redeem the 14¼% Preferred Shares; (d) whether the Board intends to make a change of control offer; [86] (e) that the Exchange Offer, and especially the Elevation, will benefit NBCU, Citadel and CIG; (f) that the Exchange is unrelated to the purpose of other aspects of the MTA; and (g) that the Elevation violates the CD.[87] Plaintiffs also allege that the Solicitation is misleading to the extent it states that: (a) the Exchange is part of a recapitalization, meaning that it is associated with improving ION's capital structure; and (b) the directors believe the Exchange is beneficial to ION, even though one of the directors testified that the Elevation should be prevented.[88] Defendants defend the adequacy of their disclosures and primarily challenge the materiality of the alleged omissions and other deficiencies.

■ As a cornerstone of corporation law, directors must uphold their fiduciary duties to the shareholders of the company.[89] When a board recommends a proposed transaction to its shareholders, these duties include disclosing information that will enable the shareholders to make an informed decision.[90] Delaware law imposes upon corporate boards the requirement that a board disclose fully and fairly all material facts within its control when it seeks shareholder action.[91] This duty, however, is not absolute and "a board is not required to engage in 'self-flagellation' and draw legal conclusions implicating itself in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication of the matter." [92]

---

**86.** Although Plaintiffs pressed this disclosure deficiency in their opening and supplemental briefs, Defendant ION filed a supplemental disclosure on July 2, 2007 with the SEC, stating explicitly that "[w]e do not intend to make an offer to repurchase the Senior Preferred Stock following a change of control that occurs in connection with the transactions contemplated by the MTA." 2d Saunders Aff. Ex 11. Because the supplemental disclosure appears to address Plaintiffs' criticism and Plaintiffs did not address this aspect of their disclosure claims in either their reply brief or at argument, I consider it to be moot.

**87.** PSB at 19–20.

**88.** *Id.*

**89.** *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1057 (Del.Ch.1987) (citing *Smith v. Van Gorkom*, 488 A.2d 858, 890 (Del.1985); *Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del.1977)).

**90.** *Id.*

**91.** *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

**92.** *Id.* at 84 n. 1.

■ The standard for materiality requires:

[a] showing of substantial likelihood that under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information available.[93]

Based on Plaintiffs' complaints about the sufficiency of ION's disclosures in connection with the Exchange Offer, I do not find that they are reasonably likely to succeed in proving coercion due to inadequate disclosures. As an initial matter, Defendants' alleged failures such as the potential "insolvency" of ION under the Contingent Exchange or the Company's plan to issue a large amount of new debt relate to matters about which the record before me is unclear. Whether or not the Board has legally available funds is, Defendants contend, largely a matter of opinion, particularly when a Board uses other information in addition to fairness opinions to make such a determination.

Relating to the potential insolvency claim, Plaintiffs largely rely on the evaluation by their expert, Sprung, to support their argument that the transactions might lead to insolvency. Sprung's conclusion stems primarily from Houlihan's estimate of ION's enterprise value and pairs the lowest enterprise value with a scenario involving little to no participation in the Exchange Offer. Defendants produced extensive financial information on ION in the

Solicitation and described surrounding factual circumstances that reflect a situation of instability for ION for which any major decision *might* lead to the potential of insolvency. In addition, as Defendants point out, Houlihan's assessment is only one of a number of methodological valuations, and it has not been shown to be conclusive. Indeed, there is no showing that Houlihan itself ever formed the opinion that the transactions were reasonably likely to lead to insolvency. As a result, Plaintiffs have not shown a sufficiently concrete danger of insolvency to lead me to conclude that such danger would have been material to a reasonable investor.

Plaintiffs also allege that the Board should have disclosed the refusal of three investment banking firms to opine on the fairness of the Exchange Offer to the preferred holders.[94] In particular, Plaintiffs emphasize that ION's SEC filing made extensive reference to, and attached, Houlihan's fairness opinion with respect to the Tender Offer. In view of that disclosure Plaintiffs contend ION should have disclosed its inability to obtain a fairness opinion in support of the Exchange Offer.[95] In fact, the June 8 Solicitation stated only that, "We [ION] have not obtained a third-party determination that the Exchange Offer is fair to holders of Senior Preferred Stock." [96]

Defendants respond that they were unable to get a fairness opinion on the Exchange Offer because the three investment banks they contacted do not give fairness opinions on this type of transaction.[97] Houlihan refused to give an opinion because it did not want to opine on fairness

---

93. *Eisenberg,* 537 A.2d at 1057 (quoting *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1985)).

94. PSB at 19.

95. *Id.*

96. June 8 Solicitation at 36.

97. IAB at 33 (citing Collins Dep. at 15).

to multiple classes of securities in the same transaction.[98] UBS would not provide a fairness opinion because it does not provide fairness opinions on restructuring exchange offers as a matter of policy.[99] Defendants do not recall requesting an opinion from Lazard.[100] Further, there is no evidence that any of the investment banks involved ever advised Defendants that the Exchange Offer was unfair.[101]

Plaintiffs' expert conclusorily suggests that the investment banks would not issue a fairness opinion on the Exchange Offer because it is unfair. The only basis for that statement, however, appears to be an inference Sprung drew based on the absence of an opinion and the banks' refusal. I am not convinced that is a reasonable inference in these circumstances. Certainly the mere absence of a fairness opinion on the Exchange Offer does not mean that it is unfair. Although a fairness opinion might have been helpful to the preferred shareholders, the ION Board's failure to disclose why it was unable to obtain a fairness opinion is not material unless it would have altered significantly the "total mix" of information provided. Because Plaintiffs have failed to demonstrate a reasonable likelihood of success in showing that ION's inability to obtain a fairness opinion on the Exchange Offer stemmed from third party concerns that it was unfair, I find that this omission is not likely to be material.

With respect to the other omissions that Plaintiffs consider material, I do not agree. In discharging their duty to fully and fairly disclose all material facts within their control when the Board seeks shareholder action, the law does not require that the Company engage in self-flagellation[102] or speculation.[103] The important facts relating to the Exchange Offer, as opposed to potential characterizations or legal or other conclusions as to those facts, do appear to have been disclosed to the shareholders.

Accordingly, I do not find that Plaintiffs have a reasonable likelihood of success on the merits that any alleged material omissions would, individually or collectively, amount to actionable coercion.

### 5. The *In Re Tri–Star Pictures, Gentile, and Gatz* extraction claims

Finally, Plaintiffs make a *Tri–Star* extraction argument, contending that the Exchange Offer represents an unlawful redistribution of value from minority shareholders to NBCU and CIG, thereby giving rise to a direct claim for breach of fiduciary duty that must be judged under the "entire fairness" standard enunciated in *Weinberger v. UOP, Inc.*[104] Plaintiffs further claim that entire fairness cannot be demonstrated here because the Exchange Offer is nothing more than a "wrongful and completely unnecessary gift to NBCU and CIG" that fails to serve any legitimate business purpose.[105]

**98.** *Id.* Houlihan provided the fairness opinion for the Tender Offer for the common stock.

**99.** S. Smith Aff. ¶ 12.

**100.** IAB at 33 (citing Millstein Dep. at 16–17).

**101.** *See* F. Smith Dep. at 127–28.

**102.** *Stroud,* 606 A.2d at 84 n. 1.

**103.** *Loudon v. Archer–Daniels–Midland Co.,* 700 A.2d 135, 143 (Del.1997) (explaining that

"[s]peculation is not an appropriate subject for a proxy disclosure."); *see also In re The MONY Group, Inc. S'holders Litig.,* 853 A.2d 661, 682 (Del.Ch.2004) (stating that "as a general rule, proxy materials are not required to state opinions or possibilities.") (internal citations omitted).

**104.** 457 A.2d 701 (Del.1983).

**105.** POB at 25–26.

 Generally, a shareholder owes a fiduciary duty only if it a) owns a majority interest in or b) exercises control over the business affairs of the corporation.[106] Upon a determination that a shareholder has fiduciary duties and has engaged in a self-dealing transaction, the standard of "intrinsic fairness" (or "entire fairness," as addressed in *Weinberger v. UOP*) applies, having the effect of shifting the burden of proof to defendants.

 The Supreme Court has held that when a controlling shareholder extracts financial benefit from the shareholders and procures a financial benefit exclusive to himself, the non-controlling shareholders have a direct claim for breach of fiduciary duty.[107] Analogous to a majority shareholder situation, upon the determination that a controlling shareholder has effected such financial redistribution, the entire fairness standard applies and defendants must then prove that the transaction alleged involved fair dealing and a fair price.[108]

Although a majority of shares owned by a shareholder would be conclusive in finding that a controlling shareholder exists, the reverse cannot be said to be true. The Supreme Court has found, for example, that, although only owning 43.3% of the shares, a shareholder did, in fact, exercise control over the business affairs of the corporation.[109] In another situation, the Court of Chancery rejected at the motion to dismiss stage a plaintiff's contention that a company holding a 44% interest exercised actual control over another corporation's conduct sufficient to deem it a controlling shareholder.[110]

 Here, Plaintiffs have not shown a reasonable likelihood of success on the merits of their argument that NBCU, CIG, or a combination of the two might otherwise be a *de facto* or controlling shareholder. Before the MTA, Plaintiffs provide a bevy of examples in which NBCU, at least indirectly, exerted some influence over the ION Board decisions, several of which I have identified in the analysis relating to actionable coercion. Lawrence Patrick, Chairman of ION, told John Dubel, co-chair of the Ad Hoc Committee of 14¼'s, that NBCU would block the Ad Hoc Committee's alternative proposal.[111] Lazard and Pillsbury Winthrop advised the Special Committee as to the difficulty of completing a proposal without the participation of NBCU due to its rights under the 2005 Agreements.[112] Millstein testified that Lazard found it very difficult to come up with a transaction that did not require NBCU's consent and described ION as having "a capital structure with [NBCU] deeply embedded and having significant consent rights." [113]

To a large extent, however, NBCU's impact on the Board's decisions were a

**106.** *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (1987).

**107.** *Gentile v. Rossette*, 906 A.2d 91, 100 (2006).

**108.** *Weinberger*, 457 A.2d at 710.

**109.** *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1115–16 (Del.1994).

**110.** *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *5, 2006 Del. Ch. Lexis 160, at *18–19 (Aug. 25, 2006).

**111.** Fay Supp. Aff. Ex. L (Dubel Dep. at 115–16). "The [ION] board we felt was, our opinion, was being controlled by NBC and that whatever NBC told the board to do was what would happen." *Id.*

**112.** Fay Aff. Ex. K (May 8, 2007 Solicitation at 16).

**113.** Fay Supp. Aff. Ex B (Millstein Dep. at 78).

result of contractual obligations between NBCU and ION requiring NBCU's consent in, among other things, certain financial transactions contemplated by ION, such as annual budgets, recapitalizations, and mergers. In addition, NBCU had the transferable call option from Paxson and his affiliates that, if triggered, would give NBCU a controlling block of Class A and Class B common stock.

Nevertheless, there has been no showing that Defendant NBCU or Citadel, separately or collectively, had close to a majority of the ION shares during the negotiations toward the MTA. No member of the ION Board was controlled by either Citadel or NBCU.[114] The opposition of ION's CEO Burgess, a former NBCU employee, to use of a Special Committee for this transaction was overruled by the Board of Directors.[115] Burgess was not appointed to the Special Committee. And, Burgess is contractually barred from acting on behalf of NBCU in any way, having any arrangements with NBCU, or receiving any compensation or benefits of any kind from NBCU, beyond his severance, pension benefits and the like.[116] Thus, although NBC has strong contractual rights that color the situation at hand, Plaintiffs have not persuaded me that they are likely to succeed in proving that the holding of those contractual rights, coupled with a significant equity position and other factors, warrant even a *provisional* conclusion that NBCU is a controlling shareholder. Plaintiffs' showing as to Citadel during the period before the MTA is weaker still.

The ION environment following the close of the Tender Offer also supports this determination. Since the launch of the Exchange Offer and even following the Tender Offer, neither CIG nor NBCU has become a majority shareholder; that will not happen until the FCC actually approves the series of transactions in terms of "attributable interest." The record reflects an ongoing negotiation between NBCU and Citadel representatives and the Special Committee. Even on the day the MTA was approved, members of the Special Committee sought to negotiate better recovery values for the Senior Preferred Shareholders.[117] To be clear, I am not, at this time, conclusively determining that neither Citadel nor NBCU nor the two of them together are, in fact, controlling shareholders. Having found that Plaintiffs are not likely to succeed in proving that NBCU, Citadel, or CIG was a controlling shareholder during a relevant time period, I also find no reasonable likelihood of success on their *Tri–Star* claim.

## C. Irreparable Harm

 Plaintiffs have not shown that they will suffer irreparable harm if the Exchange Offer is consummated. There is no irreparable harm if money damages are adequate to compensate Plaintiffs[118] or if the equitable remedy of rescission is available as a reasonably practicable way to return the parties to their pre-Exchange Offer positions.[119] Further, there is no *per*

**114.** Saunders Aff. Ex. 7 (Lodge Dep. at 41–42).

**115.** Millstein Aff. ¶ 8; Saunders Aff. Ex. 10 (F. Smith Dep. at 78).

**116.** Hendershot Aff. Ex. 3 at 15, Ex. 25 at 7; Bockhaus Dep. at 139.

**117.** Fay Aff. Ex A.

**118.** *Cottle v. Carr,* 1988 WL 10415, at *5, 1988 Del. Ch. Lexis 21, at *14–15 (Feb. 9, 1988); *In re W. Nat'l Corp. S'holders Litig.,* 1998 WL 51733, AT *2, 1988 Del. Ch. Lexis 52, at *7 (Feb. 4, 1988).

**119.** *In re W. Nat'l Corp. S'holders Litig.,* 1998 WL 51733, at *2 n. 8, 1988 Del. Ch. Lexis 52, at *7 n. 8 (availability of rescission renders threatened harm reparable, rather than "ir-

*se* right to injunctive relief merely because a tender offer may be defective.[120]

Plaintiffs have an adequate remedy at law available to them in the form of money damages, if they ultimately prevail on the merits of their claims. Plaintiffs themselves contend that the combination of debt and preferred shares they will receive if they tender into the Exchange Offer is worth only 71% of the value of the Preferred Stock they now hold. If they do not tender, Plaintiffs allege that their shares will lose market value; if no Senior Preferred Stockholders tender, the Elevation will drive $415 million of value of the non-CIG Preferred Stockholders outside the current enterprise value of ION. Thus, they will be pushed "out of the money," and their shares will only be worth approximately 70–78% of their current value. What Plaintiffs have failed to do, however, is adequately explain why this Court cannot simply award them money damages in the event they ultimately prove successful on the merits of their claims. The loss of market value between two dates seems to be a classic example of the type of injury that is compensable with monetary damages. Plaintiffs have not shown that their monetary losses are of the type that warrant the extraordinary remedy of a preliminary injunction.

The equitable remedy of rescission is also available as a possible form of relief if Plaintiffs prove successful on the merits of their case. In fact, Plaintiffs' Complaint explicitly seeks rescission and rescissory damages as forms of relief.[121] Moreover, Plaintiffs have failed to rebut Defendants' arguments that rescission is a feasible remedy in this case. The facts here closely mirror those in *News International v. Warner Communications* [122] where this Court explained that

> the transaction sought to be restrained does propose an exchange of stock between two Delaware corporations, both of which are before the Court. Should this exchange be found improper hereafter on a more fully developed record, there would seem no impediment at present to a direction that the transaction be undone by means of each corporation returning its shares in the other to the other.

The same reasoning applies in this case. No party disputes that ION, CIG, and NBCU are all organized under Delaware law. If Plaintiffs prove their case on the merits after having the opportunity to develop a more detailed factual record, Plaintiffs can return the Series A and Series A–1 notes and any financial consideration issued to holders of Senior Preferred Stock in the Exchange Offer to ION for reissued Senior Preferred Shares. NBCU and Citadel can, should they choose to, renegotiate those aspects and extend a revised exchange offer and consent solicitation. I acknowledge that Defendants have negotiated the Exchange Offer as one aspect of a larger transaction, the MTA. Having said that, however, Defendants' decision to formulate the transaction as they did created the risk that it might need to be modified. Moreover, their risk of accepted Senior Preferred Shares to the Exchange Offer was their choice. Even

---

reparable"); *News Int'l plc v. Warner Commc'ns, Inc.*, 1984 WL 21871, at *2, 1984 Del. Ch. Lexis 551, at *4–5 (Jan. 12, 1984); *Cascella v. GDV, Inc.*, 1979 WL 2711, 1979 Del. Ch. Lexis 486 (June 21, 1979).

**120.** *Cottle*, 1988 WL 10415, at *5, 1998 Del. Ch. Lexis 21, at *14.

**121.** Compl. ¶¶ 71, 90.

**122.** 1984 WL 21871 at *2, 1984 Del. Ch. Lexis 551, at *4–5.

though some additional ancillary relief may be necessary to return the parties to the position they occupied before the Exchange Offer closed, this does not appear to be the type of case where it will be especially difficult to "unscramble the eggs" if the Exchange Offer proves to warrant the equitable remedies of rescission and rescissory damages.

Plaintiffs' primary argument for irreparable harm is closely tied to their coercion claims. Plaintiffs argue that the coercive nature of the Exchange Offer deprives them of their right to choose alternatives based purely on those alternatives' economic merit and thus irreparably harms them by depriving them of the right to make an uncoerced decision. As support for their argument, Plaintiffs rely upon *Eisenberg v. Chicago Milwaukee Corp.*[123] In *Eisenberg*, this court enjoined a pending self-tender offer for a company's preferred stock because, among other things, the tender offer materials included a statement (threat) that the directors intended to request the NYSE to delist the non-tendering shares once the tender offer was completed.[124] The court found that the "disclosure" that the directors intended to request the delisting of the non-tendering shares tipped in favor of the plaintiff's otherwise weak showing of coercion and rendered the offer at issue coercive.

The defendants in *Eisenberg* argued that any harm to the plaintiffs was remediable by money damages. Plaintiffs in this case rely heavily upon the following response of the court:

> [B]ut that argument overlooks the gravamen of the injunction claim. Here the principal dispute is not that the offering price is unfair. Rather, at issue is the shareholders' right to make an informed, uncoerced decision. That right is specific, and its enforcement requires a specific, not a substitutional, remedy. As this Court has recognized, to permit a deficient offer to go forward might forever deprive the tendering shareholders of their right to be treated fairly. In that event the harm could not easily be undone, and given the nature of the shareholder interests at stake, damages would not be a meaningful or adequate remedy. Therefore, the threatened harm is irreparable.[125]

In *Eisenberg*, the finding of a coercive tender offer disclosure is woven into the Court's decision to grant the preliminary injunction. The Court is clear that the inadequate disclosure was part of the harm that "might forever deprive the tendering shareholders of the right to be treated fairly."[126] In this case, however, Plaintiffs have not succeeded in showing that the disclosure materials accompanying the June 8 Solicitation are inadequate or materially misleading. Neither have they presented any credible evidence that might lead this Court to find that the 14¼% Preferred Stock in this case will otherwise be irreparably harmed if the Exchange Offer goes forward. As discussed above, money

---

123. 537 A.2d 1051 (Del.Ch.1987).

124. *Id.* at 1058–61.

125. Id. at 1062. Plaintiffs apparently read *Eisenberg* as stating a *per s* e rule that coercive tender offers will be enjoined. In *Cottle v. Carr*, 1988 WL 10415, at *5, 1988 Del. Ch. Lexis 21, at *14–15 (Feb. 9, 1988), however, Chancellor Allen emphasized that infringement of the "abstract right of free choice"

does not necessarily constitute irreparable harm. Thus, even if Plaintiffs had demonstrated a likelihood of success on their claim of actionable coercion, which they did not, the Court still would question whether Plaintiffs have made an adequate showing of irreparable harm in these circumstances.

126. *Eisenberg,* 537 A.2d at 1062.

damages or rescission should be available to make Plaintiffs whole if they suffer damages as a result of the Exchange Offer.

Plaintiffs also make a weak argument that they will suffer irreparable harm if the Exchange Offer is conducted because the non-tendering Senior Preferred Stockholders will have their holdings pushed outside the enterprise value of ION, thus frustrating Plaintiffs' legal remedy of money damages. The cases Plaintiffs cite, such as *Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc.*[127] are inapposite. Those cases involve circumstances where assets are being dissipated. In *Tanimura*, for example, the plaintiffs alleged dissipation of assets from a trust at issue and had shown that if the dissipation continued, they would be unable or least unlikely later to collect on a money judgment.[128] The Plaintiffs in this case have not presented any credible evidence that ION is insolvent, is likely imminently to become insolvent, or would otherwise be unable to compensate Plaintiffs for any monetary harm they might suffer if the Exchange Offer is consummated. For these reasons, I conclude that Plaintiffs have failed to carry their burden of proving that they will be irreparably harmed if a preliminary injunction is not granted.

### D. Balance of the Equities

■ Neither party has made an especially strong showing that issuance or non-issuance of a preliminary injunction will cause them substantially more or less harm than will be suffered by the other party. Plaintiffs contend that a preliminary injunction will not harm ION because, under the worst case scenario

where none of the Senior Preferred Stockholders tender their shares, one of ION's directors admitted that, other things equal, the financial result for ION would be better if the Exchange Offer were enjoined.[129] Plaintiffs have not, however, shown that this worst case scenario is at all likely, nor have they persuasively argued that a limited admission by one director suffices to show that ION will not suffer harm if a preliminary injunction is issued.

Defendants, on the other hand, offer make-weight arguments that a preliminary injunction will create uncertainty and confusion about ION's capital structure at a time when the company is trying to move forward with a new business plan. They argue that enjoining the transaction will place the company in a lengthy state of "limbo" and will jeopardize its future prospects for success. I do not find these arguments especially persuasive. Any transaction of any size costs time and money. Defendants drafted the MTA; yet, they did not include a "time is of the essence" provision as to the Exchange Offer. Indeed, as Plaintiffs point out, the other transactions contemplated by the MTA are not contingent upon the Exchange Offer closing. Also, ION announced that it would extend the Exchange Offer for ten business days if less than 50 percent of the Preferred Stockholders tender by the June 11, 2007 deadline. If the timing of the Exchange Offer were critical, Defendants could have accounted for that in the MTA or in their own conduct of the Exchange Offer. Otherwise, Defendants have not made any specific arguments or proffered specific evidence demonstrating any significant harm

---

**127.** 222 F.3d 132 (3d Cir.2000).

**128.** *Id.* at 139. *See, e.g., Brenntag Int'l Chems., Inc. v. Bank of India,* 175 F.3d 245, 250 (2d Cir.1999); *Drobbin v. Nicolet Instru-*

*ment Corp.,* 631 F.Supp. 860, 912 (S.D.N.Y. 1986).

**129.** Fay Supp. Aff. Ex. A 174–176.

they will suffer if the Exchange Offer is preliminarily enjoined. Thus, on this record, Defendants have not convinced me that any delay caused by issuing a preliminary injunction will burden them more than the absence of an injunction will harm Plaintiffs.

### 1. Laches

■ Defendant's, especially CIG, also argue that Plaintiffs prejudicially delayed in bringing this motion for a preliminary injunction and that this delay either warrants application of the equitable doctrine of laches or weighs against Plaintiffs in balancing the equities. "Laches may apply if a defendant has knowledge of a claim and prejudices the defendant by unreasonably delaying in bringing the claim." [130] Defendants complain that Plaintiffs delayed for over a month before filing this suit, despite the fact that Plaintiffs were aware of the MTA and its provision for the Exchange Offer since the public announcement on May 4, 2007. Indeed, Defendants allege that some of the Plaintiffs were involved with the Ad Hoc Committee of Preferred Stockholders that presented competing·proposals to the ION Board of Directors when it was accepting offers.

CIG objects that Plaintiffs knew about the MTA and its Exchange Offer, had previously complained about the Exchange Offer as coercive, yet delayed for over a month while CIG closed its tender offer for the common shares, at a cost of almost $70 million.

■ Although Defendants have shown that Plaintiffs delayed for over a month before bringing this suit, they have not convinced me that, under the present circumstances, such delay was *unreasonable,* nor have Defendants demonstrated that they have been *prejudiced* by Plaintiffs' delay. The implication of Defendants' arguments is that Plaintiffs should have filed suit as soon as the MTA was announced, but they have failed to explain why Plaintiffs delay was unreasonable. Plaintiffs waited until they were certain that the Exchange Offer was going to be conducted and that it was going to be conducted with terms and under conditions that Plaintiffs consider coercive. They also waited until the disclosure materials accompanying the Exchange Offer were disseminated. Ultimately, they filed suit approximately five days after ION launched the Exchange Offer. This behavior is not unreasonable.

Nor do I find that Defendants have been prejudiced by Plaintiffs' delay. CIG complains that Plaintiffs waited until CIG had committed almost $170 million to ION, through the Tender Offer for the common shares and the anticipated cash infusion before seeking to enjoin the Exchange Offer. The problem with this argument is that CIG did not condition the Tender Offer on the Exchange Offer, let alone completion of it within a specific time period. Indeed, NBCU and CIG apparently contemplated the possibility that the Exchange Offer might be delayed, or might not be consummated at all. In the MTA, the Exchange Offer was not a condition precedent to the tender offer for the common shares, nor is it grounds for termination of the MTA itself.[131] Indeed, the MTA provides for contingent relief in case the Exchange Offer does not close.[132] For

---

130. *Akande v. Transamerica Airlines, Inc.,* 2007 WL 1555734, at *14, 2007 Del. Ch. Lexis 68, at *51 (May 25, 2007) (citations omitted).

131. MTA, Arts. XI, XII.

132. MTA, § 10.18.

these reasons, I find that the application of laches is not warranted in this case because Plaintiffs have not unreasonably delayed in bringing this suit, and Defendants have not been prejudiced by Plaintiffs' failure to file their Complaint more quickly. Weighing all of these factors, I find that the balance of equities does not tip strongly in favor of any of the parties.

## III. CONCLUSION

For the reasons stated, the Court denies Plaintiffs' motions for preliminary injunction in both CA. Nos. 3021 and 3043.

**IT IS SO ORDERED.**

