## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NEC FUND VI HE LENDER, LLC, NEC FUND VI HE LENDER (OFFSHORE), LLC, and NEC FUND VI HE LENDER (SIGNATURE), LLC, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2025-0875-KSJM |
| HECATE HOLDINGS LLC and HECATE ENERGY GROUP LLC, | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 12, 2025
Date Decided: February 25, 2026

A. Thompson Bayliss, Caleb R. Volz, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Robert A. Skinner, ROPES & GRAY LLP, New York, New York; Sarah M. Samaha, ROPES & GRAY LLP, Washington, D.C.; Peter J. Sheffer, ROPES & GRAY LLP, Boston, Massachusetts; *Counsel for Plaintiffs, NEC Fund VI HE Lender, LLC, NEC Fund VI HE Lender (Offshore), LLC, and NEC Fund VI HE Lender (Signature), LLC.*

J. Peter Shindel, Jr., FOX ROTHSCHILD LLP, Wilmington, Delaware; Edward N. Moss, Anirudh Bansal, Jason M. Hall, Andrew K. Leedom, Jason M. Ecker, CAHILL GORDON & REINDEL LLP, New York, New York; *Counsel for Defendants Hecate Holdings LLC and Hecate Energy Group LLC.*

Michael A. Barlow, Morgan R. Harrison, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, Delaware; Mario O. Gazzola, Julia Teixeira Rodrigues, Olivia Probetts, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; Eric Winston, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Los Angeles, California; *Counsel for Intervenors LCM Fund II Sidecar 1, LP and LCM Fund II Sidecar 2, LP.*

**McCORMICK, C.**

The plaintiffs loaned $82 million to Defendant Hecate Holdings LLC ("Holdings") in late 2023. The plaintiffs made the loan with the understanding that Holdings would exercise its contractual right to "put" its 60% stake in Hecate Energy Group LLC ("HEG") to HEG's minority member, Repsol Renewables North America, Inc. ("Repsol"). Holdings would then use the proceeds from the put option to repay the loan, under which the plaintiffs are currently owed $120 million. Holdings exercised its put option in June 2024, but Repsol delayed the contractual appraisal process for valuing the option, leaving Holdings to question whether Repsol intended to close the transaction. Holdings sued Repsol in this court to enforce the put option, and the parties settled the litigation. Holdings agreed to acquire Repsol's minority stake in HEG, as opposed to the other way around. As part of this transaction, Repsol paid HEG $75 million—the value that a third-party appraiser had ascribed to Holdings' 60% stake in HEG.

The plaintiffs have rights to collateral under the loan and pledge agreements, with "collateral" defined to include the proceeds of the put option. During settlement negotiations with Repsol, Holdings treated the $75 million in settlement proceeds as the plaintiffs' collateral and assured the plaintiffs that the money would be wired to plaintiffs' control account, as required under the loan and pledge agreements. But late in negotiations, Holdings instructed Repsol to wire the settlement proceeds to HEG instead.

The plaintiffs sued Holdings and HEG to enforce their protective rights under the loan and pledge agreements. They claim that Holdings breached the loan and

pledge agreements and that HEG converted the $75 million. They moved for a preliminary injunction to require Holdings and HEG to wire the settlement proceeds into the plaintiffs' control account. This decision resolves the motion for a preliminary injunction.

Although the plaintiffs have shown a likelihood of success on their contract claims, they have not shown that success on those claims warrants the relief they seek. And although the plaintiffs have shown a threat that the defendants might not be able to satisfy a monetary judgment, they have not shown that the equities tilt in their favor. The motion is denied.

## I. FACTUAL BACKGROUND

The facts are drawn from the 163 exhibits submitted with briefing and three affidavits.[1]

### A. Hecate, Repsol, And The Put Option

Holdings owns a membership interest in HEG. Distributions from HEG constitute Holdings' only material source of income.[2] HEG owns effectively 100% of non-party Hecate Energy LLC, the operating company ("Hecate" or the "Company").

---

[1] This decision cites to the parties' submissions in Docket C.A. No. 2025-0875-KSJM by "Dkt." number, and to the following exhibits submitted with briefing by brief and "Ex." number: Exs. 1 through 93 to NEC's Opening Br., Dkts. 91–93; Exs. 1 through 31 to LCM's Answering Br., Dkts. 94, 95; Exs. A through L to LCM's Intervenor Compl., referenced in its Answering Br., Dkt. 52; Exs. 1 through 6 to Hecate's Opposition Br., Dkt. 96; Exs. 1 through 21 to NEC's Reply Br., Dkt. 103. This decision cites to the following Affidavits by the affiant's last name: Chris Bullinger (CEO of Hecate Holdings), John Bills (Partner at PEI Global Partners LLC), and Andrew Gordon (Partner at Paul, Weiss, Rifkind, Wharton & Garrison LLP), Dkt. 96.

[2] NEC's Opening Br., Ex. 1 at 12–13.

Chris Bullinger, Nick Bullinger, Fazli Qadir, and David Tohir own approximately 72% of Holdings and serve as members of HEG's management and Board of Directors (the "Board").[3] Chris Bullinger is CEO of Holdings, HEG, and Hecate.[4]

Hecate flips energy projects.[5] It acquires land rights, organizes contractors and suppliers, and oversees project construction.[6] Hecate borrows money to develop its projects.[7] It then sells the projects for more than the development costs.[8] Hecate structures the payment terms so that it receives some payment upfront and additional proceeds when the project reaches development milestones.[9]

In May 2021, Holdings sold a 40% membership interest in HEG to Repsol, a subsidiary of a multi-national energy company.[10] The agreement valued HEG at approximately $530 million.[11] As part of the transaction, Repsol and Holdings entered into an Amended and Restated Limited Liability Company Agreement (the "LLC Agreement").[12]

---

[3] NEC's Opening Br., Ex. 1 at 4–5; *id.* Ex. 3 at 42–43.

[4] C. Bullinger Aff. ¶ 1.

[5] *Id.* ¶ 5.

[6] *Id.*

[7] *Id.* ¶¶ 7–8.

[8] *Id.* ¶¶ 5–7.

[9] *Id.* ¶ 6.

[10] *Id.* ¶¶ 10–11.

[11] *Id.* ¶ 11.

[12] NEC's Opening Br., Ex. 5 (LLC Agreement).

The LLC Agreement gave Holdings a put option.[13]   Under Section 10.3, Holdings had the right to sell its 60% interest in HEG to Repsol at "Fair Market Value" beginning on June 25, 2024 (the "Put Option" or "Put Transaction").[14]  The LLC Agreement established a process for determining Fair Market Value.  If the parties could not first agree on Fair Market Value, then the Fair Market Value would equal the average of the values calculated by each party's appraisal firm.[15]  A third appraisal firm would determine the final value if the first two firms' valuations differed by 10% or more.[16]

## B.    NEC Lends To Holdings.

On September 29, 2023, Plaintiffs NEC Fund VI HE Lender, LLC, NEC Fund VI HE Lender (Offshore), LLC, and NEC Fund VI HE Lender (Signature), LLC (collectively, "Plaintiffs" or "NEC") entered into a loan agreement with Holdings (the "Loan Agreement").[17]

Holdings borrowed $65 million under the Loan Agreement.[18]  Holdings had until December 31, 2024 to repay the loan.[19]  In December 2023, the parties increased the loan principal to $82 million.[20]

---

[13] *Id.* § 10.3.

[14] *Id.*

[15] *Id.* at -635.

[16] *Id.*

[17] Dkt. 1 (Compl.), Ex. A (Loan Agreement).

[18] Loan Agreement § 2.1, Schedule X.

[19] *Id.* § 2.7, Schedule X.

[20] NEC's Opening Br., Ex. 10 § 2.

4

According to CEO Chris Bullinger,[21] "it was always understood that NEC would be repaid from the proceeds of a monetization event of Hecate Holdings' shares of HEG (presumably through the Put/Call Transaction)."[22] And Bullinger represented that the value of the Put Option would cover the loan. In an August 2023 email to NEC, Bullinger valued the Put Option between "$1.2 to $1.8 billion (and higher)."[23]

The parties also signed a Pledge and Security Agreement (the "Pledge Agreement"). The Pledge Agreement provides NEC a security interest in "Collateral."[24] The definition of "Collateral" includes "contract rights (including the Put Option)."[25] The Pledge Agreement also pledges "all economic rights and proceeds" to NEC from Holdings' membership interest in HEG.[26]

NEC secured other protections under both the Loan and Pledge Agreements. The Loan Agreement requires Holdings to place proceeds from Collateral into NEC's control account.[27] And it prevents Holdings from amending agreements governing the Collateral without NEC's consent.[28] Similarly, the Pledge Agreement forecloses

---

[21] C. Bullinger Aff. ¶ 1.

[22] *Id.* ¶ 14.

[23] NEC's Opening Br., Ex. 4 at -168.

[24] Compl., Ex. D ("Pledge Agreement") § 2(b).

[25] *Id.* § 2(b)(ii).

[26] *Id.* § 2(b).

[27] Loan Agreement, Schedule X at 3; *id.* §§ 5.1(d), 5.2(h), 5.4.

[28] *Id.* § 5.1(d).

5

Holdings from selling the Put Option for less than the amount due on the Loan Agreement without NEC's consent.[29]

An event of default triggers additional protections under the Loan and Pledge Agreements. Section 6.1 of the Loan Agreement describes several events of default, including if "fair market value of the Collateral, as reasonably determined by Lenders after consultation with Borrower, is more likely than not less than $200 million," a breach of "any agreement made part of the Collateral," and the failure to pay the principal within five business days of December 31, 2024.[30] An event of default allows NEC to declare the loan payable and direct the disposition of Collateral.[31] Section 2.2(c) of the Loan Agreement charges 18% interest on overdue principal and interest.[32] And NEC can step in as Holdings' attorney-in-fact to "accept an offer of Put/Call Transaction consideration . . . and collect all proceeds[.]"[33]

## C. Holdings Exercises The Put Option.

Holdings exercised its Put Option on June 25, 2024.[34] By that time, Repsol had concerns about the Company's financial situation. It observed that "the Company ha[d] a significant amount in accounts payable overdue" and "struggled to

---

[29] Pledge Agreement § 2(b) ("[W]ithout the consent of Administrative Agent, Grantor will not agree to any consideration for the Put/Call Transaction that would result in cash proceeds realized by Grantor less than the amount necessary to fully repay the Loan and all associated Obligations.").

[30] Loan Agreement § 6.1.

[31] *Id.* § 6.2.

[32] Loan Agreement § 2.2(c); *id.*, Schedule X (defining "Interest Rate").

[33] Pledge Agreement § 4(a)(i).

[34] NEC's Opening Br., Ex. 2 ¶ 10.

meet its payroll obligations."[35]  Further, a consultant concluded that the Company had "not been able to achieve long and short-term projections" and its "backlog and pipeline are of poor quality and show uncertainties to succeed."[36]

Repsol delayed commencing the contractual appraisal process to value the Put Option.  On September 5, 2024, Holdings filed an action in this court seeking to force Repsol to consummate the Put Option.[37]  The court scheduled trial for January 31, 2025.[38]

### D.    Hecate Tries To Stabilize Its Financing.

The Repsol litigation further strained Hecate's resources.  Hecate expected Repsol to acquire some of Hecate's projects.  The litigation jeopardized those sales.[39] Hecate struggled to raise additional capital.[40]  And the litigation diverted significant time, personnel, and funding.[41]  Liquidity dwindled.[42]

Hecate's operational struggles impacted its lending relationships.  When Holdings filed suit against Repsol, Hecate had a $250 million term loan and a $300 million revolving letter-of-credit facility (the "Galaxy Facility").[43]  HEG guaranteed

---

[35] *Id.*, Ex. 15 at -952–53.

[36] *Id.*, Ex. 12 at -749.

[37] *Id.*, Ex. 2 ¶¶ 4, 19; *id.* at -445 (showing date of the action).

[38] C.A. No. 2024-0928-KSJM, Dkt. 27.

[39] C. Bullinger Aff. ¶ 16.

[40] *Id.*

[41] *Id.*

[42] *Id.* ¶ 17.

[43] NEC's Opening Br., Ex. 13 at -959; *id.,* Ex. 14 at -045.

7

the Galaxy Facility.[44]  Hecate breached several of the Galaxy Facility's financial covenants.[45]

Hecate sought to stabilize its finances.  In late 2024, Hecate entered into a forbearance agreement with its existing lenders. [46]  As part of the transaction, affiliates of Lumina Capital Management ("LCM"), a Brazilian hedge fund, purchased the Galaxy Facility's term loan.[47]  LCM and other lenders extended forbearance until January 31, 2026.[48]  And Plaintiffs and Holdings extended the Loan Agreement to June 30, 2025.[49]

### E.    Repsol And Holdings Start Negotiating A Settlement.

On January 31, 2025, Holdings and Repsol executed a Letter Agreement and Binding Term Sheet to settle their litigation.[50]  That agreement began the process to determine the Fair Market Value of the Put Option.[51]  Because Repsol and Holdings "anticipate[d] that the appraiser valuations from Barclays and Morgan Stanley [would] be more than 10% apart," they "agree[d] to select and jointly retain Evercore

---

[44] LCM's Intervenor Compl., Ex. A ("Galaxy Collateral Agreement") § 1.1 (defining the "Sponsor," HEG, as a "Guarantor").

[45] NEC's Opening Br., Ex. 14 at -045.

[46] *Id.*, Ex. 22.

[47] *See id.*, Ex. 23.

[48] C.A. No. 2025-0875-KSJM, Dkt. 117.

[49] NEC's Opening Br., Ex. 19 (Second Amendment to Loan Agreement) § 2.

[50] *Id.*, Ex. 24.

[51] *Id.*

as the third-party appraiser to determine the Put Transaction Purchase Price."[52] From there, the parties would enter into a membership interest purchase agreement based on Evercore's determined price.[53]

Fulfilling the parties' prediction, Morgan Stanley's and Barclays' valuations diverged. Morgan Stanley, Holdings' appraiser, valued HEG at $2.7 billion.[54] Barclays, Repsol's appraiser, valued HEG at $0.[55] Ultimately, Evercore valued HEG at $125 million.[56] Under Evercore's valuation, Holdings' 60% interest was valued at $75 million.[57]

In late May, the Hecate treasurer asked Plaintiffs for their control account information.[58] The treasurer stated that the transaction could happen soon.[59] This led Plaintiffs to believe that they would receive the $75 million in their control account under the Loan Agreement.

Plaintiffs also sought more information. Repeatedly, they asked Chris Bullinger and other Hecate principals for copies of the Letter Agreement and Binding

---

[52] *Id.* at -192.

[53] *Id.* at -198.

[54] *Id.*, Ex. 25 at -422.

[55] *Id.*, Ex. 13 at -979.

[56] *Id.*, Ex. 29 at -855.

[57] *Id.*

[58] *Id.*, Ex. 27 at -810; *id.,* Ex. 6 at 221.

[59] *Id.*, Ex. 6 at 221.

Term Sheet as well as the three valuations.[60]  In response, Bullinger shared only Morgan Stanley's $2.7 billion valuation.[61]

On June 4, Plaintiffs sent a Notice of Events of Default and Exercise of Lender Rights to Holdings.[62]  Plaintiffs asserted two defaults: first, that the market value of its Collateral fell under $200 million; and second, that Holdings was amending the terms of the Put Option, Plaintiffs' Collateral, without Plaintiffs' consent.[63]  Given the defaults, Plaintiffs invoked their powers of attorney-in-fact and asserted that they had the right to control the Collateral.[64]

On June 23, Bullinger emailed Plaintiffs drafts of the Confidential Settlement and Release Agreement (the "Settlement Agreement") and a Membership Interest Purchase Agreement (the "MIPA").[65]

The draft Settlement Agreement contemplated something other than the Put Transaction.  It provided that Repsol would: (1) transfer *its* 40% membership interest in HEG to Holdings for $1 and the cancellation of the Put Option; (2) pay $75 million to Holdings; and (3) pay HEG $10 million to satisfy all payment obligations in connection with two solar projects.[66]

---

[60] *Id.*, Ex. 34 at -920–21; *id.*, Ex. 35 at -002–003.

[61] *Id.*, Ex. 34 at -920.

[62] *Id.*, Ex. 36.

[63] *Id.* at -060.

[64] *Id.* at -060–061.

[65] *Id.*, Ex. 40.

[66] *Id.* at -120.

The draft MIPA showed that Holdings' counsel revised it to provide that Repsol wire the $75 million to Plaintiffs' control account.[67] This provision gave Plaintiffs some comfort.

Plaintiffs requested greater comfort. Communicating with Holdings' counsel and Bullinger, Plaintiffs emphasized that the Settlement Agreement and MIPA should clarify that the $75 million is "in further consideration of the cancellation and termination of the [Put Option]."[68] And on June 26, Holdings' counsel assured Plaintiffs that they would "work in [Plaintiffs'] comments."[69] The next day, Holdings again confirmed they would incorporate Plaintiffs' comments: "As discussed, we will incorporate the additional asks around the consideration re: cancellation of the put in the next draft."[70]

Holdings then backtracked. On June 28, Holdings' counsel agreed to raise Plaintiffs' comments only "orally" with Repsol because they wanted "to minimize changes and maximize the goodwill towards a settlement."[71] Plaintiffs pushed back, offering to engage with Repsol directly.[72] Holdings then shared the latest Settlement

---

[67] *Id.* at -155.

[68] *Id.*, Ex. 41 at -695, -724.

[69] *Id.*, Ex. 42 at -783.

[70] *Id.*, Ex. 43 at -212, -227, -290.

[71] *Id.*, Ex. 44 at -485.

[72] *Id.* at -484.

11

Agreement draft, which continued to reflect that the $75 million would be paid into Plaintiffs' control account.[73]

### F.    Holdings Directs The Settlement Proceeds To HEG.

While Holdings was negotiating with Repsol, Holdings was simultaneously proposing refinancing options to Plaintiffs. On June 30, 2025, Chris Bullinger proposed an allocation of the $75 million: $15 million to its unsecured creditors, $20 million to Hecate principals as a "Tax Distribution," and $40 million to Plaintiffs.[74] Then Holdings would pay the remaining loan balance with discounted equity.[75] Additionally, Bullinger proposed another approach where Plaintiffs receive the $75 million and then reinvest it into HEG in exchange for a new security.[76]

Meanwhile, on July 2, 2025, Holdings' counsel changed the MIPA so that the $75 million would go to HEG instead of Plaintiffs' control account.[77] Holdings did not inform Plaintiffs of this change. Plaintiffs continued to push for settlement updates and entertain refinancing proposals.

On July 7, 2025, Plaintiffs reminded Repsol's counsel that any change to the Put Option required Plaintiffs' consent under the Loan Agreement.[78] The next day,

---

[73] *Id.* at -505, -567.

[74] *Id.*, Ex. 46 at -699.

[75] *Id.*

[76] *Id.*, Ex. 48 at -804.

[77] *Id.*, Ex. 51 at -801.

[78] *Id.*, Ex. 52.

Repsol asked Holdings how it planned to address this issue.[79] Holdings' counsel replied,

> Because our settlement is not a put transaction under the [HEG] LLCA by which [Repsol] is acquiring [Holdings'] interests (in fact, our transaction contemplates the opposite), NEC has no rights to approve our settlement and/or to the proceeds. Further, we are placing the proceeds in HEG because that is where (as you know) the money is needed.[80]

On July 11, Plaintiffs responded to the refinancing proposal and Holdings' July 7 communication with their own solution: Repsol wires $75 million to the control account, Holdings repays its remaining loan balance with additional units in HEG, and Plaintiffs invest $45 million in HEG for a 45% ownership stake.[81]

On July 14, Plaintiffs sent a Supplemental Notice of Events of Default and Exercise of Lender Rights to Holdings.[82] Adding to the prior two defaults, it explained that Holdings' failure to repay its obligations under the Amended Loan Agreement by July 8 qualified as another default.[83]

The next day, Bullinger disclosed that the $75 million would not be directed to Plaintiffs' control account as prior drafts of the MIPA had reflected.[84] In the same

---

[79] *Id.*, Ex. 53 at -815.

[80] *Id.*, Ex. 54 at -995.

[81] *Id.*, Ex. 55 at -036; *see also* C. Bullinger Aff. ¶ 21.

[82] *Id.*, Ex. 56.

[83] *Id.* at -077–78.

[84] *Id.*, Ex. 57 at -735.

communication, Bullinger stated that he "believe[d] a commercial discussion could be quite productive."[85]

Holdings and Repsol executed the final Settlement Agreement on July 15, 2025.[86] Under the Settlement Agreement:

- Repsol transferred its 40% membership interest in HEG to Holdings in exchange for $1.00 and cancellation and termination of the Put Option.[87]

- Repsol paid $75 million to HEG, not into Plaintiffs' control account.[88]

- Repsol paid $10 million to HEG in satisfaction of existing or future payment obligations related to two solar projects.[89]

- Holdings, HEG, and their affiliates released all potential claims against Repsol.[90]

On July 21, 2025, Bullinger shared a third refinancing option with Plaintiffs.[91] Like prior proposals, it envisioned distributing the $75 million to Plaintiffs, who would in turn reinvest the money in HEG.[92] Plaintiffs never agreed to any of the refinancing options.

---

[85] *Id.*

[86] Compl., Ex. I (Settlement Agreement).

[87] *Id.* § 1(a).

[88] *Id.* § 1(b); *id.* (Membership Interest Purchase Agreement), Ex. B (Wire Instructions for Payment) (showing payment to HEG's bank account).

[89] Settlement Agreement § 1(c).

[90] *Id.* §§ 2(a), 2(c).

[91] NEC's Opening Br., Ex. 60 at -721.

[92] *Id.* at -725.

### G.     Plaintiffs File This Litigation.

On July 30, 2025, Plaintiffs filed their Verified Complaint for Injunctive and Other Relief (the "Complaint") against Holdings and HEG ("Defendants").[93] The Complaint asserts three counts:

- In Count I, Plaintiffs claim that Holdings breached the Pledge Agreement when it modified the Put Option without Plaintiffs' consent and when it defaulted under the Loan Agreement.

- In Count II, Plaintiffs claim that Holdings breached the Loan Agreement due to several defaults and by failing to deposit the $75 million into its control account.

- In Count III, Plaintiffs assert a conversion claim against Holdings and HEG, alleging that Defendants wrongfully exerted control of their Collateral.[94]

Plaintiffs moved to expedite proceedings.[95] They also moved for a temporary restraining order and a preliminary injunction seeking transfer of the $75 million to their account.[96] In response, Defendants stipulated to a Status Quo Order enjoining Defendants from transferring the $75 million in settlement proceeds "to any person or entity other than Plaintiffs" pending the court's decision on the preliminary injunction.[97] Defendants also agreed to expedition on Plaintiffs' motion for a

---

[93] Compl.

[94] *Id.* ¶¶ 90–128.

[95] *See* Dkt. 1 (Mot. for Expedition).

[96] *See id.*

[97] Dkt. 111 ¶ 5.

15

preliminary injunction.[98]  The parties completed briefing the motion on November 10.[99]  The court heard argument on November 12.[100]

## H.    Another Creditor Moves To Intervene.

Meanwhile, on August 18, 2025, affiliates of LCM moved to intervene.[101]  LCM asserts a claim to the $75 million.[102]  As creditors to Hecate, LCM held perfected security interests in receivables resulting from Repsol Renewables Development Company LLC's ("RRDC") agreement to make milestone payments for energy projects.[103]  The Settlement Agreement, however, released RRDC from making those payments.[104]  LCM thus argues that at least $58 million of the $75 million traces back to their security interest in the energy project receivables.[105]

## I.    Additional Developments

While the court held Plaintiffs' motion for a preliminary injunction under submission, Holdings and HEG continued reporting on developments involving HEG. Defendants have maintained throughout this litigation that they are solvent, and

---

[98] *Id.* ¶ 1.

[99] Dkt. 103.

[100] Dkt. 112.

[101] Dkt. 11.  The LCM affiliates who moved to intervene are: LCM Fund II Sidecar 1, LP and LCM Fund II Sidecar 2, LP.  *Id.*  For simplicity, this decision refers to them collectively as "LCM."

[102] *Id.*

[103] *Id.* ¶¶ 9–12; *see also* Galaxy Collateral Agreement § 3.

[104] Dkt. 11 ¶¶ 15–17; *see also* Settlement Agreement § 1(c).

[105] Dkt. 11 ¶ 1.

16

that Plaintiffs thus face no irreparable harm. The updates identified new transactions that, in Defendants' view, confirm their solvency.

On December 24, 2025, Defendants entered into a binding Membership Interest Purchase Agreement to sell an energy project.[106] The agreement obligates the purchaser to pay Hecate $100 million in tranches upon the completion of project milestones.[107] The purchaser has paid Hecate approximately $29 million to date.[108]

On January 22, 2026, HEG signed an agreement with EGH Acquisition Corp., a Special Purpose Acquisition Vehicle, to take HEG public on the NASDAQ stock exchange.[109] The transaction valued HEG at $1.2 billion.[110] The transaction can provide up to $155 million for the development of utility-scale energy projects.[111] EGH shareholders must approve the transaction for it to close.[112]

Meanwhile, Holdings' debt continues to accumulate interest at a rate of 18%.[113] As of February 13, Holdings owed approximately $120 million to Plaintiffs.[114]

---

[106] Dkt. 124 at 2.

[107] *Id.*

[108] *Id.*

[109] Dkt. 121, Ex. A at 1.

[110] *Id.*

[111] *Id.*

[112] *Id.* Plaintiffs responded to Defendants' January 22 letter informing the court of the SPAC transaction accusing Defendants of hiding the fact that FTI Consulting, Inc. had sued Hecate Holdings for approximately $235,000. Dkt. 122 at 3. Later, FTI agreed to a payment plan and dismissed its lawsuit with prejudice. Dkt. 124, Ex. A.

[113] Loan Agreement § 2.2(c), Schedule X at 6.

[114] Dkt. 125 at 2.

## II.     LEGAL ANALYSIS

The standard for obtaining a preliminary injunction is typically articulated as follows: "To obtain a preliminary injunction, a plaintiff must demonstrate: (i) a reasonable probability of success on the merits; (ii) that they will suffer irreparable injury if an injunction is not granted; and (iii) that the balance of the equities favors the issuance of an injunction."[115]

If a plaintiff seeks mandatory relief, however, the court adjusts the standard. As this court explained in *In re COVID-Related Restrictions on Religious Services*, "[i]njunctive relief comes in three flavors: TROs, preliminary injunctions, and permanent injunctions."[116] "Each flavor of relief also can take one of two forms. One form is a prohibitive injunction stopping a defendant from taking action. The other form is a mandatory injunction compelling a defendant to take affirmative action."[117] "Particularly at early stages of the case, mandatory forms of relief require a greater showing."[118]  As the Delaware Supreme Court explained in *C & J Energy Services, Inc. v. City of Miami Employees' and Sanitation Employees' Retirement Trust*, "[t]o issue a mandatory injunction requiring a party to take affirmative action . . . the Court of Chancery must either hold a trial and make findings of fact, or base an

---

[115] *Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104, at *9 (Del. Ch. June 20, 2019); *see also Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1090 (Del. Ch. 2004) (weighing likelihood of success "even more heavily" where the "merits determination is, for all practical purposes, akin to a final ruling").

[116] 285 A.3d 1205, 1226 (Del. Ch. 2022), *aff'd*, 326 A.3d 626 (Del. 2024).

[117] *Id.* at 1226 n.4.

[118] *Id.*

injunction solely on undisputed facts."[119]  For that reason "[m]andatory injunctions should only issue with the confidence of findings made after a trial or on undisputed facts."[120]

Plaintiffs seek both prohibitive and mandatory relief.  They ask that the court "prohibit[] Hecate Holdings and HEG from further transferring any portion of the Collateral, inclusive of the $75 million in cash proceeds from the Settlement Agreement, to any person or entity other than Plaintiffs."[121]  They also ask that the court mandate Defendants "to transfer all of the Collateral, inclusive of the $75 million in cash proceeds from the Settlement Agreement, to Plaintiffs."[122]  To obtain a mandatory injunction, Plaintiffs must meet the more onerous burden of proof it involves.

### A.    Likelihood Of Success

To demonstrate a likelihood of success, a plaintiff must establish a "reasonable probability of success on the merits."[123]  "A party showing a reasonable probability of success must demonstrate that it will prove that it is more likely than not entitled to relief."[124]  This standard "falls well short of that which would be required to secure final relief following trial, since it explicitly requires only that the record establish a

---

[119] 107 A.3d 1049, 1071 (Del. 2014).

[120] *Id.* at 1053–54.

[121] Dkt. 1 (Mot. for Prelim. Inj.).

[122] *Id.*

[123] *Pell v. Kill*, 135 A.3d 764, 783 (Del. Ch. 2016).

[124] *C & J Energy Servs.*, 107 A.3d at 1067 (cleaned up).

19

reasonable probability that this greater showing will ultimately be made."[125]  Yet again, when the preliminary relief sought is mandatory, a plaintiff must make a stronger factual showing.

To support their motion for a preliminary injunction against Holdings, Plaintiffs rely on their claims for breach of the Pledge and Loan Agreements.  To support their motion against HEG, Plaintiffs rely on their claim of conversion.  Defendants refute Plaintiffs' merits arguments and raise a threshold issue of subject-matter jurisdiction.  This analysis addresses the threshold issue before turning to the merits of the contract and conversion claims.

### 1.    Subject Matter Jurisdiction

Defendants argue that this court lacks subject matter jurisdiction over Plaintiffs' claims.  The Court of Chancery has limited jurisdiction.[126]  The court "can acquire subject matter jurisdiction over a cause in only three ways, namely, if: (1) one or more of the plaintiff's claims for relief is equitable in character, (2) the plaintiff requests relief that is equitable in nature, or (3) subject matter jurisdiction is conferred by statute."[127]

---

[125] *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998) (quoting Donald J. Wolfe, Jr. and Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 10–2(a)).

[126] *See El Paso Nat. Gas Co. v. TransAmerican Nat. Gas Corp.*, 669 A.2d 36, 39 (Del. 1995) ("The Delaware Court of Chancery is a court of equity. It has only that limited jurisdiction that the Court of Chancery in England possessed at the time of the American Revolution, or such jurisdiction as has been conferred upon it by the Delaware General Assembly.")

[127] *Candlewood Timber Gp., LLC v. Pan Am. Energy*, LLC, 859 A.2d 989, 997 (Del. 2004) (footnotes omitted).

Under the clean-up doctrine, "the court may also exercise ancillary jurisdiction over purely legal causes of action that are 'part of the same controversy over which the Court originally had subject matter jurisdiction in order to avoid piecemeal litigation.'" [128] If a plaintiff has adequately pled a basis for subject-matter jurisdiction, then the court applies a multi-factor analysis to determine whether to assert ancillary jurisdiction. [129] Those factors include judicial efficiency. [130]

Plaintiffs plead a basis for equitable jurisdiction. They seek equitable relief in the form of a preliminary injunction. Defendants argue, however, that it is equitable in form only. [131] According to Defendants, Plaintiffs' requested injunction to send $75 million to their control account is just a claim for money damages disguised as a request for equitable relief.

---

[128] *Rodriguez v. Great Am. Ins. Co.*, 2021 WL 4892216, at *3 (Del. Ch. Oct. 20, 2021) (quoting *Kraft v. WisdomTree Invs. Inc.*, 145 A.3d 969, 974 (Del. Ch. 2016)); *Wilmont Homes, Inc. v. Weiler*, 202 A.2d 576, 580 (Del. 1964) ("[O]nce a right to relief in Chancery has been determined to exist, the powers of the Court are broad and the means flexible to shape and adjust the precise relief to be granted so as to enforce particular rights and liabilities legitimately connected with the subject matter of the action.") (citing 1 John N. Pomeroy, *A Treatise on Equity Jurisprudence* § 115 (5th ed. 1941) [hereinafter Pomeroy]); *see also Getty Ref. & Mktg. Co. v. Park Oil, Inc.*, 385 A.2d 147, 150 (Del. Ch. 1978) (citing *Mackenzie Oil Co. v. Omar Oil & Gas Co.*, 120 A. 852 (Del. Ch. 1923); Pomeroy § 175) (discussing policy reasons for clean-up doctrine).

[129] *Acierno v. Goldstein*, 2004 WL 1488673, at *5 (Del. Ch. June 25, 2004) (citing *Clark v. Teeven Hldg. Co.*, 625 A.2d 869, 882 (Del. Ch. 1992)) (listing the factors as "whether retention of the claims will: 1) resolve a factual issue which must be determined in the proceedings; 2) avoid a multiplicity of suits; 3) promote judicial efficiency; 4) do full justice; 5) avoid great expense; 6) afford complete relief in one action; or 7) overcome insufficient modes of procedure at law").

[130] *Id.*

[131] Hecate's Opposition Br. at 23–25.

Defendants ignore that Plaintiffs sought another form of equitable relief, a temporary restraining order, at the outset of this litigation. That prompted the parties to stipulate to a form of status quo order. The status quo order provided equitable relief. It "enjoined [Defendant] from transferring any portion of the funds at issue, inclusive of the $75 million in cash proceeds from the Settlement Agreement to any person or entity other than Plaintiffs."[132]

Thus, regardless of whether Plaintiffs' request for a preliminary injunction is truly equitable in nature, Plaintiffs have asserted at least one valid basis for equitable jurisdiction. That allows the court to exercise clean-up jurisdiction.[133] Because this court has invested considerable time in managing this action, judicial efficiency warrants keeping the case. This court therefore has subject matter jurisdiction over this action.

### 2.      Breach Of Contract

To prevail on a claim for breach of contract, a party must demonstrate the existence of a contract, the breach of an obligation imposed by that contract, and harm or damage resulting from the breach.[134]

---

[132] Dkt. 111 ¶ 5.

[133] *Tull v. Turek*, 147 A.2d 658, 665 (Del. 1958) (explaining "that once equity has acquired jurisdiction of a cause, it will retain that jurisdiction to give final relief to end the controversy. This remains the rule even though circumstances have arisen after the filing of the complaint which make the equitable relief prayed for impracticable"); *see also DBMP LLC v. Delaware Claims Processing Facility, LLC*, --- A.3d ---, 2025 WL 3013006, at *13 (Del. Ch. Oct. 24, 2025) (exercising "subject matter jurisdiction based on the initial need for preliminary injunctive relief").

[134] *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

Holdings does not dispute that Plaintiffs have met the elements of a claim for breach of contract. Nor could it. Under the Loan Agreement, Holdings must pay the loan principal by July 8, 2025.[135] To date, Holdings has not paid any principal.[136] Holdings has thus breached the Loan Agreement.

Nor does Holdings dispute that it breached the Pledge Agreement. Section 2(b) of the Pledge Agreement prevents Holdings from "amend[ing] . . . any term or condition of the Put Option or any Put/Call Transaction without the express written consent of [NEC]."[137] By executing the Settlement Agreement, Holdings terminated and cancelled the Put Option without NEC's consent.[138] A termination or cancellation is an amendment—a dramatic one. Again, Holdings does not dispute any of this.

But the success relevant to this analysis must support the relief Plaintiffs seek. Plaintiffs seek an injunction that would compel Holdings and HEG to transfer $75 million to Plaintiffs' control account or restrict Defendants' use of those funds pending final resolution of their claims.[139] It is not clear that Plaintiffs' breach of contract claims entitle them to the $75 million now, for two reasons. Most importantly, given

---

[135] Second Amendment to Loan Agreement § 2; Loan Agreement §§ 2.7(a), 6.1(a).

[136] Compl. ¶ 86; *see also* Hecate's Opposition Br. at 1 ("Plaintiffs made a loan to Defendant Hecate Holdings that has come due, and they seek repayment. They are owed money.").

[137] Pledge Agreement § 2(b).

[138] Settlement Agreement § 1.

[139] *See C & J Energy Servs.*, 107 A.3d at 1071 ("[A] mandatory injunction require[s] a party to take affirmative action.").

the structure of the Settlement Agreement, it is unclear whether the $75 million constitutes Collateral. Moreover, even if Plaintiffs can claim entitlement to the $75 million, so does LCM.[140] LCM's position is sufficient to raise factual disputes. As a result, Plaintiffs have not demonstrated the level of success needed to support a mandatory injunction.

### 3. Conversion

Plaintiffs assert a conversion claim against HEG and Holdings. Conversion claims require that: the plaintiff has a property interest in the allegedly converted property; the plaintiff has a right to possession of that property; and the defendant wrongfully possessed or disposed of the property as if it were the defendant's own.[141]

Plaintiffs' claim fails on the first element, because whether Plaintiffs have a property interest over the $75 million requires further factual development. Aspects of the record weigh in Plaintiffs' favor. The negotiation history reflects that Holdings contemplated that the settlement proceeds would be sent to Plaintiffs' control account.[142] Holdings even assured Plaintiffs that this would occur during that time.[143] The amount of consideration matches Evercore's valuation of Holdings' interest.[144] And the Settlement Agreement settled litigation over the Put Option.[145]

---

[140] *See* Dkt. 11 (asserting LCM's entitlement to the collateral).

[141] *Israel Discount Bank of N.Y. v. First State Depository Co., LLC*, 2012 WL 4459802, at \*13 (Del. Ch. Sep. 27, 2012), *aff'd*, 86 A.3d 1118 (Del. 2014) (TABLE).

[142] NEC's Opening Br., Ex. 40 at -155; *id.*, Ex. 41 at -724; *id.*, Ex. 42 at -783.

[143] *Id.*, Ex. 42 at -783.

[144] *Id.*, Ex. 29 at -855.

[145] Settlement Agreement at 1.

But Repsol did not acquire *Holdings'* 60% interest in HEG under the Settlement Agreement. Rather, Holdings acquired *Repsol*'s interest in HEG. Thus, it is not clear that the $75 million is "proceeds realized from the Put/Call Transaction" under the Pledge Agreement,[146] which defines "Put/Call Transaction" only as "any transaction involving the transfer of any of [Holdings'] interest in [HEG] *to Repsol*."[147]

Although the Settlement Agreement altered the Put Option and thus breached Plaintiffs' protective rights by doing so, Plaintiffs have not demonstrated at this stage that they are likely to prevail on their claim to prohibit use of the $75 million, much less meet the more onerous factual burden necessary to obtain a mandatory injunction.[148]

---

[146] Pledge Agreement § 2(b)(xiii); *see also id.* § 2(b)(ii).

[147] Loan Agreement, Schedule X (defining "Put/Call Transaction") (emphasis added).

[148] HEG also argues that Plaintiffs' claim for conversion is, in essence, a claim for the payment of money and thus prohibited under Delaware law. "It is settled in Delaware that 'an action in conversion will not lie to enforce a claim for the payment of money.'" *Anschutz Corp. v. Brown Robin Capital, LLC*, 2020 WL 3096744, at *18 (Del. Ch. June 11, 2020) (quoting *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 889–90 (Del. Ch. 2009)). Unlike other states, no case in Delaware has yet recognized an exception for conversion of specific money. *AM Gen. Hldgs. LLC ex rel. Ilshar Capital LLC v. Renco Gp., Inc.*, 2013 WL 5863010, at *16 (Del. Ch. Oct. 31, 2013) (explaining that "in none of these cases did the Court hold that such a limited [conversion] exception existed in Delaware"); *Anschutz*, 2020 WL 3096744, at *18 (explaining that "Delaware law has not formally recognized any exceptions to this [conversion] rule"). HEG's alternative argument thus asks whether Delaware should recognize an exception and, if so, whether Plaintiffs' claim falls within it. This decision does not plumb the depths of HEG's alternative argument, but rather, merely flags it as an issue that the court might need to address at a later stage in the action.

## B. Irreparable Harm

Harm is irreparable unless "alternative legal redress is clearly available and is as practical and efficient to the ends of justice and its prompt administration as the remedy in equity."[149] Because a preliminary injunction is an extraordinary form of equitable relief, it should not be granted if the injury to the moving party is merely speculative.[150] Although the difficulty in calculating damages may constitute irreparable harm,[151] "[m]ere apprehension of uncertain damage or insufficient remedy will not support a finding of irreparable harm."[152]

Defendants contend that Plaintiffs' action boils down to a contract claim for money damages,[153] which cannot support irreparable harm.[154] Defendants' argument has intuitive appeal. At bottom, Plaintiffs seek immediate payment of $75 million—that sounds a lot like a claim for money damages.

But this court has recognized in limited circumstances that a plaintiff can demonstrate irreparable harm by showing that they "would be unable or [at] least

---

[149] *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 838 (Del. Ch. 2011) (quoting *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 557 (Del. Ch. 2000)).

[150] *Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917, at *5 (Del. Ch. Nov. 5, 2004).

[151] *Rubin*, 770 A.2d at 557.

[152] *Alpha Builders*, 2004 WL 2694917, at *5.

[153] Hecate's Opposition Br. at 36–37.

[154] *In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 729232, at *18 (Del. Ch. Mar. 6, 2012) ("A harm that can be remedied by money damages is not irreparable.")

unlikely later to collect on a money judgment."[155]   To meet the standard, a plaintiff could show that the defendant "is insolvent, is likely imminently to become insolvent, or would otherwise be unable to compensate Plaintiffs for any monetary harm they might suffer . . . ."[156]

Plaintiffs argue that Defendants are insolvent or, at the very least, facing imminent insolvency.  Courts use two tests for insolvency.  Under the cash flow test, a business is insolvent if it cannot "meet maturing obligations as they fall due in the ordinary course of business."[157]  Under the balance sheet test, a business is insolvent if its liabilities exceed its assets.[158]

Plaintiffs only need to satisfy one of the tests.[159]   And Plaintiffs have demonstrated insolvency or a threat of insolvency under the cash-flow test.  Plaintiffs have demonstrated that Defendants are unable to timely meet maturing obligations in the ordinary course of business.  Holdings' debt to Plaintiffs is its primary

---

[155] *Gradient OC Master, Ltd. v. NBC Universal, Inc.*, 930 A.2d 104, 134 (Del. Ch. 2007); *see also Brinati v. TeleSTAR, Inc.*, 1985 WL 44688, at *4 (Del. Ch. Sep. 3, 1985) ("Injunctive relief is appropriate where the evidence . . . raises serious questions about defendants' ability to pay a damage award.").

[156] *Gradient*, 930 A.2d at 134.

[157] *Prod. Res. Gp., L.L.C. v. NCT Gp., Inc.*, 863 A.2d 772, 782 (Del. Ch. 2004) (quoting *Siple v. S & K Plumbing and Heating, Inc.*, 1982 WL 8789, at *2 (Del. Ch. Apr. 13, 1982)).

[158] *Id.*

[159] *See id.* (explaining that plaintiffs only need to satisfy one of the two tests to show a defendant's insolvency); *see also Bighorn Ventures Nev., LLC v. Solis*, 2022 WL 17948659, at *7 (Del. Ch. Dec. 23, 2022) (explaining "[a] court may conclude that a corporation is insolvent for one of two reasons" and then describing the cash flow and balance sheet tests).

obligation.[160]  For months, Holdings has not repaid a cent of principal, which has grown to approximately $120 million.[161]  In briefing, Defendants effectively concede Holdings' inability to timely pay what is due to Plaintiffs by emphasizing that they need the funds to meet "payroll and other obligations."[162]  Nor can HEG pay its lenders in the ordinary course of business.  HEG signed a forbearance agreement on over $300 million of debt for that reason.[163]  And HEG extended its forbearance for another year as it negotiates a refinancing package.[164]

Defendants point to recent developments—Holdings' signing of a SPAC transaction and HEG's project sale—to show that Holdings can make future payments.[165]

The recently announced de-SPAC transaction does not improve Holdings' position because several obstacles impede cash from reaching Holdings.  First, the transaction could take months to close.[166]  Second, the SPAC investors may choose to

---

[160] *See* C. Bullinger Aff. ¶ 14 ("Hecate Holdings is, and has always been, a true holding company.").   Holdings  holds  HEG,  which  in  turn  holds  the  operating  company, Hecate.  *Id.* ¶ 9.

[161] Dkt. 125 at 2.  Holdings must pay 18% default interest under the loan agreement. Loan Agreement § 2.2(c), Schedule X (defining "Interest Rate").

[162] Hecate's Opposition Br. at 56.

[163] Dkt. 117.

[164] *Id.*

[165] Dkts. 121, 124.

[166] NEC's Opening Br., Ex. 71 ¶ 29.

redeem their shares, reducing the proceeds available to HEG.[167]  Third, transaction costs could further reduce the proceeds.[168]  Fourth, HEG, not Holdings, receives the proceeds, making them subject to LCM's security interest.[169]  Fifth, Holdings would only receive shares that it could not sell for months.[170]  And there is no telling how shares in a company taken public through a de-SPAC transaction will perform.[171]

Nor does HEG's project-level revenue improve Holdings' solvency.  Milestone payments under project agreements are made to Hecate or its affiliates.[172]  LCM has security interests in those funds.[173]  Holdings is thus structurally subordinated to debt at the HEG level.[174]  Project sales therefore do not necessarily translate to cash

---

[167] *Id.* ¶ 30; *see also Delman v. GigAcquisitions3, LLC*, 288 A.3d 692, 706 (Del. Ch. 2023) ("Approximately 29% of public stockholders elected to redeem 5.8 million shares.").

[168] NEC's Opening Br., Ex. 71 ¶ 30; *see also GigAcquisitions3, LLC*, 288 A.3d at 702, 724 (stating that the SPAC had approximately $40 million of transaction costs relative to $200 million of potential proceeds).

[169] *See* Galaxy Collateral Agreement § 3.

[170] NEC's Opening Br., Ex. 71 ¶ 30; *see also* Dkt. 122 at 3 (noting that the shares will be subject to a lock-up).

[171] *See In re Hennessy Capital Acq. Corp. IV S'holder Litig.*, 318 A.3d 306, 310 (Del. Ch. 2024), *aff'd*, 337 A.3d 1214 (Del. 2024) ("As the dust of SPAC mania settled, a sobering picture emerged. Early-stage companies strained to adapt to the demands of being exchange listed and struggled to remain viable amid economic headwinds. The stocks of many de-SPACed companies fell well below the $10 initial public offering price—the same price available to redeeming stockholders. Some companies filed for bankruptcy.").

[172] C. Bullinger Aff. ¶¶ 6, 9.

[173] Galaxy Collateral Agreement § 3.

[174] *See* LCM Answering Br. at 6, 40 (explaining the risks of lending to a holding company).

29

for Holdings. In turn, they do not cure Holdings' inability to meet its obligations in the ordinary course of business.

Thus, if the threat of a defendant's insolvency is sufficient to show irreparable harm, then Plaintiffs have met their burden of demonstrating irreparable harm.

## C. Balance Of The Equities

"[A] court of equity has discretion to grant or deny an application for injunctive relief in light of the relative hardships of the parties."[175] A party cannot invoke equitable principles to assert harm "due to the Court's enforcement of the rights and obligations for which it specifically bargained[.]"[176] Equity requires the court to consider harm to "other identified interests" and to avoid "risk[ing] greater harm to defendants [or] the public . . . in granting the injunction, than it seeks to prevent."[177]

The requested injunction would risk significant harm to Defendants. Defendants have shown that HEG needs money to continue project construction, purchase equipment, and keep land options.[178] It is also a critical time for HEG. New projects must begin by July 2026 to qualify for renewable energy tax credits.[179] Freezing $75 million thus limits HEG's ability to preserve existing projects and start

---

[175] *Cantor Fitzgerald*, 724 A.2d at 587 (quoting *Bernard Personnel Consultants, Inc. v. Mazarella*, 1990 WL 124969, at *2 (Del. Ch. Aug. 28, 1990)).

[176] *True N. Commc'ns Inc. v. Publicis S.A.*, 711 A.2d 34, 45 (Del. Ch. 1997).

[177] *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 838 (Del. Ch. 2011) (quoting *Lennane v. ASK Comput. Sys., Inc.*, 1990 WL 154150, at *6 (Del. Ch. Oct. 11, 1990)).

[178] C. Bullinger Aff. ¶ 27.

[179] *Id.* ¶ 29.

new ones. An injunction either prohibiting Defendants' use of the funds or mandating the funds' transfer would thus pose significant harm to Defendants.

The requested mandatory injunction also risks harm to third parties. LCM, the senior secured lender under the Galaxy Facility, argues that a substantial portion of the $75 million reflects the value of receivables that served as its collateral.[180] An order transferring the funds to Plaintiffs could thus impair LCM's security interests and reorder creditor priorities, all on a preliminary record. This also weighs against the requested mandatory injunction.

## III. CONCLUSION

Although Plaintiffs have shown a likelihood of success on aspects of their claims, they have not demonstrated entitlement to the injunctions they seek. Even if Defendants' imminent insolvency supports a finding that Plaintiffs face irreparable harm, Plaintiffs have not shown that the equities weigh in their favor. For these reasons, Plaintiffs' motion for a preliminary injunction is denied.

---

[180] Dkt. 11.